## COURT OF APPEALS.

MARY HARTUNG, plaintiff in error agt. THE PEOPLE, defendants in error.

Where the plaintiff in error had been convicted of *murder* upon a legal trial, and had been sentenced to be executed, and this court *reversed the judgment,* on the ground that the legislature had subsequently enacted a statute which forbade the execution of such sentence, and provided for punishment by *imprisonment and death;* which latter statute this court declared to be an *ex post facto* law and *void,* as applicable to this case, *(see 22 N. Y. R.,* 95:)

*Held,* that the plaintiff in error could not be *again tried and convicted for the same murder :* And the act of 1861, repealing the repealing act of 1860 in relation to such punishment, and restoring the former statute in that respect, could not destroy the effect of a *judgment pronounced* in the meantime, and while the first repealing act (1860) *was in force.*

The *award of a new trial* by this court, on reversing the former judgment, was improvidently granted. The plaintiff in error was entitled to her *discharge.* And the court of *oyer and terminer* could properly order the discharge of the plaintiff in error without a further trial, notwithstanding the formal order for a new trial by this court, the facts and reasons involved in the judgment of reversal warranting such discharge, being *contained in the record* which was before that court.

*March Term,* 1863.

WRIT OF ERROR to the general term of the supreme court of the third judicial district. The decision of the general term is reported 23 *How. Pr. R.,* 314, where the facts are fully stated.

WM. J. HADLEY, *for plaintiff in error.*

IRA SHAFER, *district att'y, for people, def'ts in error.*

Hartung agt. The People.

DENIO, Ch. J.   When the case of the plaintiff in error came before us on a former occasion, she had been convicted of murder upon a legal trial, and had been sentenced to be executed.   This court then reversed the judgment, because the legislature had subsequently enacted a statute which forbade the execution of such sentences as that which had been pronounced against her, and had required that such convicts should be subjected to imprisonment at hard labor for one year, and, as we construed the legislative intention, should thereafter be executed if the governor should issue his warrant for such execution.   We considered this provision for imprisonment and death in the same case to be an *ex post facto* law, and held it to be void, because the constitution of the United States had prohibited the states from enacting such laws.   It was considered to be *ex post facto*, because it attempted to change the punishment which the law had attached to the offence of the prisoner when it was committed, not by remitting some desirable portion of it, but by altering its kind and character. The principle of the judgment then rendered has been since reaffirmed and applied in the case of *Shepherd* agt. *The People*, decided in December last, but not yet reported.*

Laying out of view for the moment the act relating to murder, passed in the year 1861, and considering this case as uninfluenced by that act, the inquiry is, whether this convict can be again tried and convicted for the same murder ?   The legislature, by declaring that persons under sentence of death when the act of 1860 was passed, instead of being executed according to their sentences and according to the law as it had existed up to that time, should be put to hard labor for a considerable period, and afterwards hold their lives at the pleasure of the executive, and be executed when in his discretion he should think proper so to order, did respectively repeal, as to that class of offenders, the prior law for the punishment of murder.   As the

---

* Since reported, 24 *How. Pr. R.*, 388.

Hartung agt. The People.

punishment attempted to be substituted for that provided by the antecedent law which had been abolished, could not be applied on account of the constitutional prohibition, it followed inevitably that the interference of the legislature had rendered it impossible that the prisoner should be punished under either law. It was not a sufficient answer to the difficulty to say that the members of the legislature did not probably intend to grant impunity to offenders in the situation of the prisoner. They did intend to abrogate as to her, and as to all persons in the same situation, the former punishment, and that design they effectually carried out. They intended also that such offenders should be punished in another way, but this they could not effect on account of the constitutional inhibitions. The reversal of the judgment against this prisoner, proceeding, as it did, upon the absence of any law for the punishment of her offence, has effectually exempted her from being again tried and sentenced for the murder charged in the indictment, as it shielded her from the execution of the sentence already pronounced. If a new verdict of guilty should be returned on a second trial, it would be impossible to render a judgment of death pursuant to the Revised Statutes, because the legislature had forbidden her to be punished in that way. It would be as true after such fresh trial and verdict, that she was a person who had been under sentence of death, when the act of 1860 was passed, as it was when we reversed the judgment; and the same reason which compelled us to reverse that judgment would preclude the giving a similar judgment upon the second verdict, and would require the reversal of such second judgment, if one should be rendered. It would be equally impossible to pronounce the compound judgment of imprisonment at hard labor, and a subsequent execution, as mentioned in the act of 1860, because the constitutional objection to that law would apply to the case after a second trial, and a new conviction, in the same manner as it did

to the judgment rendered upon the first conviction. It is therefore apparent to my mind, that in reversing the judgment which had been rendered against the prisoner, we necessarily determined that the legislature had so interfered with the arrangements for the punishment of the crime of murder, that a particular class of offenders, embracing the prisoner, could not be punished at all. It was the duty of the court of oyer and terminer to give effect to that judgment, in its disposition of the prisoner's case, upon the record being remitted to that court. The order which it made was in accordance with the law as it was here adjudged, and unless the act of 1861 affects the case, we think it was the only order which it could lawfully make.

There is a view of this case which requires some further explanation. If it were true that the only part of the act of 1860 which was designed to reach the case of offences committed before that act was passed was the 10th section, which declares that persons then under sentence of death or awaiting sentence upon a conviction for murder should be punished in a particular way, and if all other provisions of the act were prospective only, then inasmuch as the substituted punishment could not be inflicted on account of the *ex post facto* character of the provision contained in that section, it might be argued that the section was void, and that it being the only provision abolishing the punishment provided by pre-existing laws, the prisoner ought to have been left to suffer according to her sentence, which was pronounced under and in accordance with these laws. It is therefore a material inquiry whether, by the true construction of the act, the former punishment was abolished generally, and the new one substituted in respect to all offences of murder already committed ? The act commences, in the first section, by declaring that no crime thereafter committed, except treason or murder in the first degree, shall be punished with death. The following sections, to the 6th inclusive, are devoted to the new definition of murder in the

first and in the second degrees, and to the mode of punish-
ishing these offences, namely, by one year's imprisonment
at hard labor, and then by a capital execution if and when
the governor shall issue his warrant as to the first, and by
perpetual imprisonment at hard labor as to the second
degree. If the act had stopped here, it ought, I think, to
have been considered as wholly prospective, and it would
have left the pre-existing laws to apply to offences com-
mitted prior to the act. But the seventh section, which
immediately follows, is an alteration of the section of the
Revised Statutes which denounced the penalty of death for
treason, murder, and the first degree of arson. It declares
that it shall be amended so as to read as follows : " Every
person who shall hereafter be convicted of treason, murder,
and arson in the first degree, as those crimes are respec-
tively defined in this title, shall be punished as herein pro-
vided." The words " herein provided" must be construed
to refer to the provision for punishment contained in the
act, and not the one mentioned in the Revised Statutes,
though if the section as thus amended kept its place in the
title of the Revised Statutes, to which it belongs, accord-
ing to the system of amendments made in that form, the
reference would be to those statutes. But such a reading
would leave all these offences without any punishment
whatever, and certainly could not have been intended.
Where new provisions or modifications of existing provi-
sions are enacted by declaring that a particular section
shall be amended so as to read in a given manner, in the
form made use of in this case, the new part is to be con-
strued, as regards the subject upon which it is to take
effect, in the same manner that an independent statute,
·having the same provisions, ought to be construed. (*Ely*
agt. *Holten*, 15 *N. Y.*, 595.) In interpreting this section
upon that principle, the new punishment mentioned in it is
attached to all future convictions, without regard to the
time when the offence was committed. It is possible that

such a verbal construction might, if there were nothing of a contrary tendency in the act, be forced to yield to the principle that a retrospective effect is not generally to be given to an act of the legislature when it can be avoided. But this could only be accomplished by rejecting the natural meaning of the language. Passing over these seventh and eighth sections as not material to the present question, we come to the tenth, which, as already mentioned, declares that all persons then (that is, at the time of the taking effect of the statute) under sentence of death, or convicted of murder and awaiting sentence, shall be punished as if convicted of murder in the first degree under the act; that is, by both imprisonment and death. This renders it perfectly certain, as it seems to me, that the change of punishment was intended to apply to offences already committed. Persons who had been convicted before the act was passed must, of course, have committed the offences of which they were convicted prior to that time. There might be a good reason for suffering offenders, who had been condemned in the course of criminal proceedings, to receive the punishment which the law had annexed to their offences, though it might at the same time be judged proper to change the punishment of those who had not yet been presented; but there can be no conceivable motive for inverting the position, by suffering the old law to remain as to offenders who were yet to be tried, while such as had received judgment under the former law should have their sentences changed by legislative enactment. The reason for a change of punishment in regard to actual convicts would apply with greater force to offenders who had not yet been prosecuted. The intention of the legislature seems to me very plain. The amendment of section one of the fourth part of the Revised Statutes prescribed the new punishment for all future convictions; and as it was not intended that the old punishment should ever be resorted to; the case of persons who had been

actually sentenced or tried and convicted, and who were awaiting sentence, was . taken up, and their punishment changed by the usual expedient of a legislative revision, so as to conform them to the altered rule, which had been established respecting future convictions and for all other cases. The last section of the act furnishes additional evidence to the same effect. It repeals, by their numbers, twelve sections of the Revised Statutes. The repeal is absolute, direct and immediate. Those sections it is said, "*are* hereby repealed." On looking at those repealed sections it will be seen that they contained provisions inconsistent with the new mode of punishment, though well suited to the former method. Section twelve required the execution to take place at a time not more remote than eight weeks from the time of the sentence, which of course would not admit of the year's intermediate imprisonment. Section thirteen required the judge who presided at the trial, immediately to send to the governor a statement of the conviction and sentence, with his notes and the testimony. There was no other apparent motive for this repeal, except that it was re-enacted in the same language in the new statute. The repeal of the fourteenth section, which empowered the governor to require the opinion of certain judicial officers upon the statement, proceeded upon some motive not apparent to me. The sixteenth, seventeenth, eighteenth and nineteenth sections of the Revised Statutes provided for the case of convicts alleged to have become insane, after being sentenced to death. A summary inquiry to determine the fact of insanity was to be instituted before a jury, and if the convict was thereby found to be insane, the execution was to be suspended until the sheriff should receive a warrant from the governor, or from the justices of the supreme court, directing the execution. The inquiry as to the existence of insanity would be pertinent under either system of punishment; but to the arrangement which required a preliminary imprisonment of

one year, and then the governor's determination that exe-
cution should take place, the provision which gave the
judges authority to issue the warrant would be hostile.
The sixteenth and seventeeth sections were therefore
allowed to stand, and the eighteenth was amended by the
eighth section of the act of 1861, by repealing the part
allowing the judges to issue the warrants. The section
was changed in another particular, not material to the pre-
sent question. By the nineteenth section the governor was
authorized, as soon as he should be convinced of the sanity
of the convict, to appoint a time and place for his execu-
tion. As this might interfere with the direction for the
year's preliminary imprisonment, at hard labor, the section
was embraced among those which were repealed. Three
of the repealed sections, the twentieth to the twenty-second
inclusive, make certain provisions for the case of a female
sentenced to death, and discovered to be pregnant. An
inquiry into the fact is directed, and the execution is to be
suspended until the impediment shall have ceased to ope-
rate, when the governor is authorized to fix a day for it to
take place. This would be unnecessary and inapplicable
where a year's imprisonment is required to intervene be-
tween the sentence and the capital infliction, though coher-
ent and judicious as applied to the former law. A similar
motive existed for repealing sections twenty-three and
twenty-four, because, under their provisions, a capital exe-
cution might take place within one year from the time of
the sentence. They required the supreme court to appoint
a time for the execution of a capital sentence, when the
time fixed by the sentence itself had, for any reason, passed
by, and to issue their warrant to the sheriff for that pur-
pose. This would take from the governor the discretion
which the new mode was intended to vest in him, and
might require the execution to take place within the year.

The reason for the repeal of section twenty-five, which
declared that the punishment of death should be by hang-

ing, it is more difficult to understand. As it seems clear that it was designed by the authors of the statute that capital punishment should in some cases be inflicted, I am inclined to suppose that the repeal of this provision was inadvertent. It is not, however, necessary to solve that doubt. The actual and immediate repeal of the sections is certain, and the consequence is the same, whatever may have been the motive which led to it.

One of the sections of the Revised Statutes, stated to have been repealed by the last section of the act of 1860, is section twenty-nine. There is no such section in that title, the section numbers ending at section twenty-seven; but the substance of an act of 1846 (*ch.* 118) is incorporated into some of the late editions of the Revised Statutes, and is there numbered twenty-nine, and it is this provision which is attempted to be repealed. (*See R. S., 5th ed., vol.* 3, *p.* 938.) It provides for the case of a prisoner under sentence of death, being confined in a jail in another county from that in which he was convicted, in consequence of the proper jail being unsafe, &c.; and the direction is, that the sheriff of the county in which he is actually confined shall, " on the day appointed for the execution of the sentence," perform that duty. It was seen that this enactment, if literally followed, would compel an execution without allowing a space for the year's imprisonment, and hence it was repealed.

I have been thus particular to state the effect of this repealing section, which took effect immediately upon the passage of the act of which this is a part, in order to show the persistent determination of the legislature that no capital execution under the former laws should thereafter take place, and to establish that there is no ground for saying that the change of punishment was intended to be prospective merely, or that there was an implied saving in the statute in respect to offences theretofore committed. The plain direction, by which the new rule is applied to all

future convictions ; the express provision made to embrace
the cases of offenders already convicted and sentenced, and
the present repeal and amendment of all those portions of
the Revised Statutes which would conflict with the imme-
diate operation of the new mode of punishment, demon-
strate, I think, the design of the legislature to apply that
mode to all future execution of sentences of death, when-
ever the offence was committed and whenever the convic-
tion took place.   I have not overlooked the rule of inter-
pretation, by which general language in a statute is re-
quired to be construed, prospectively and not retrospec-
tively, unless a contrary intention plainly appears.   A
somewhat strained construction is allowed in such cases,
when necessary to prevent injustice or public inconvenience,
and in furtherance of a presumed general intention of the
legislature.   But the section of this statute, by which
offenders, who had been actually tried, convicted and sen-
tenced when it was passed, are expressly subjected to the
new punishment, forbids any such forced construction in
the present case.   We know with absolute certainty that
it was designed by the authors of the law to apply the new
punishment to the case of offenders who had been already
convicted under the antecedent law, and we cannot there-
fore refuse to give effect to the language by which they, in
terms, subject all future convicts to such new penalty, upon
any suggestion that they did not intend what their lan-
guage naturally imports.   The effect of the provisions of
this statute therefore is, to forbid, from the time of its pas-
sage, the infliction of the penalty of death, simply and
unconnected with any other punishment, in any case, and
to substitute for such penalty the year's imprisonment, and
then the putting to death of the offender in some form, if
the governor shall so determine.   The substitute may have
the full effect intended as to future offences, but can have
no operation in respect to those already committed, for the
reason which has been mentioned.   But the pre-existing

law having been displaced by a repeal, to make room for the substituted system, it cannot be resorted to for any purpose, though such substituted system, in one aspect of it, cannot be upheld.

Some portions of the opinion prepared by Mr. Justice SUTHERLAND, in *Shepherd* agt. *The People*, (*supra*,) may be considered hostile to a portion of the reasons given for the judgment in *Hartung* agt. *The People*, as reported in the 22d volume of the *N. Y. Reports*, and which I have now more fully explained; but so far as that opinion conflicts with these reasons, it was unnecessary to the determination of the case, and was not concurred in by a sufficient number of the judges to pronounce a judgment.

We are of opinion that the act of 1861 does not affect the case of the plaintiff in error. If it could apply to persons in the situation in which she was when the act of 1860 repealed the penalty to which she was subject by the antecedent law, it must be by retracting the repealing clauses and reinstating such antecedent law, and directing its application to her case and to the cases of all other persons similarly situated. But while the repeal remained unaffected by any subsequent law, the process against the plaintiff in error came before this court in the regular course of justice, and the question was presented whether the conviction and judgment which had been pronounced respecting her should be affirmed and executed, or should be reversed and annulled as unwarranted by the then existing law; and the judgment was that it should be reversed and annulled.

No question can now be made as to the legal propriety of that determination. It is *res adjudicata* between the people of the state and the plaintiff in error. Now, acts done and closed, pursuant to a law which is subsequently repealed, must endure and stand, and be good and effectual notwithstanding such repeal. (*Dwarris on Statutes*, 534.) This was the case as to the alleged offence of the plaintiff in

error. When the process against her was presented for final adjudication in this court, and it was found that there was no law authorizing the punishment of her imputed offence, a judgment was pronounced in her favor, which absolved her from being again legally questioned for that offence. It was equivalent to an acquittal upon that charge, for it was the judgment of a court of competent jurisdiction, that in the then state of the law she could not be subjected to punishment. The effect of the repealing act of 1860 was to expunge the prior law from the statute book as completely as though it had never existed. If the legislature was competent to change this state of the law by a repeal of the repealing act, and to thus blot out such first repealing act, so that it could not thereafter be availed of, which it is not necessary to deny, still it could not, in my judgment, destroy the effect of a judgment pronounced in the meantime, and while the first repealing act was in force. Suppose a person had been prosecuted after the passage of the act of 1860, and before its repeal by the act of 1861, for an alleged murder committed before the passage of such first mentioned act, and had been acquitted, not for want of proof of the *corpus delicti*, but upon the ground on which we proceeded when this case was before us for the first time, namely : that the act of 1860 had repealed the provisions of the Revised Statutes for the punishment of murder, no one, I suppose, would maintain that such a person could be again prosecuted for the same offence after the enactment of the statute of 1861. Such prosecution, in my judgment, would be liable to be defeated by two conclusive objections : first, that the act of 1861, as applied to such a case, would be an *ex post facto* law, and unconstitutional. By the repeal of the provisions of the Revised Statutes, and the trial and acquittal of the offender, while such repealing law was in force, the act of the prisoner, though not innocent in a moral sense, would be dispunishable. A legislative act restoring the repealed

law would have precisely the same effect as though the offence had not been punishable originally, but had been made so for the first time by the restoring act. Such a law would be within the spirit of the constitutional prohibition, and would, in my opinion, be void. The other objection referred to, would arise under the constitutional injunction that no person shall be twice put in jeopardy for the same offence. These would be good pleas at the common law, and the constitution only affirms the principle, and renders it unalterable by any exertion of the law-making power. But it does not apply when the indictment was defective, so that no lawful judgment could be rendered upon it, or in the case of a mistrial, as where there was no verdict, or where the trial jury did not consist of the full number of twelve jurors, or where a new trial has been ordered on account of erroneous rulings of the first trial, or in cases of the like nature, nor where the jury was discharged upon necessity without rendering a verdict. In this class of cases it may be said that the accused was never in legal jeopardy. But when neither the indictment nor the trial was subject to any legal exception, but the conviction or judgment has failed of its natural effect by the interposition of the government or of the prosecution, it would be contrary to the spirit and intention of the rule, and of the constitutional provision in affirmance of it, if the accused could be subjected to another trial for the same offence; and, moreover, as it seems to me, it would be manifestly unjust and oppressive. If the legislature can authorize a second trial where there has been a conviction which has become ineffectual by its own interposition, it may do so when there has been an acquittal. The two cases fall within the same reason. I have not considered it necessary to refer to the numerous cases where the rule and its exceptions have been the subject of judicial exposition, because the most material of them have been very carefully examined in the opinion in the

beforementioned case of *Shepherd* agt. *The People.* That case itself is a precedent for the judgment I am about to recommend in the present instance. The offence of Shepherd, which was arson in the first degree, was committed prior to 1860, and his trial, upon which he was convicted, took place in the early part of 1861, and before the enactment of the act of that year. He was sentenced to perpetual imprisonment, in intended obedience to that act. The Revised Statutes, in force when the act of which he was accused was perpetrated, did not, as we held, warrant that mode of punishment, and the act of 1860 was held to be void in its application to that case, as being an *ex post facto* law. We were, of course, bound to reverse the judgment of the oyer and terminer, which had been affirmed by the supreme court, and the question then arose whether it was proper to award a new trial, or whether the accused should be discharged. This involved the consideration of the effect of a trial and verdict perfectly legal and regular upon an indictment in all respects sufficient, and where the only error consisted in pronouncing a judgment which was not warranted by any law. It was determined that the prisoner had been once placed in jeopardy in the sense of the constitutional provision, and we added to the reversal of the judgment an order that he should be discharged. The question did not arise, whether he could have been sentenced under the provisions of the Revised Statutes, as no such sentence had been given. The point adjudged was the same which is now presented. In neither case was there any defect or error in the indictment, trial or verdict. In the case of Shepherd the judgment was illegal; in that of the present plaintiff in error, the judgment had become illegal by the repeal of the law by which it was once authorized; but we held in the case of Shepherd that the former conviction precluded the possibility of a second trial, and on that ground we made the order for the discharge of the prisoner. The principle thus settled shows that the judg-

ment of the oyer and terminer in the present case was correct.

I have intentionally omitted, in what has thus far been said, to make any reference to the order which was entered for a new trial when the judgment against the plaintiff in error was reversed. If the effect of the judgment of reversal under the circumstances, and for the reasons upon which it proceeded, was such as to render another conviction impossible, the order so entered would not deprive her of the benefit of that judgment. It did not in terms direct a new trial upon the issue of not guilty of the murder of which she stood charged, and in connection with the reasons which were given for the judgment of reversal, it could not well have been so understood; for we hold that whether guilty or not, the legislative interposition and the constitutional prohibition against changing the punishment which existing laws had attached to an offence already committed, prevented any sentence against her. Besides, her guilt of the act charged had been established by an unexceptionable trial and verdict. If she had been punishable under the Revised Statutes, notwithstanding the act of 1860, the judgment was correct as it stood, and there was no reason for reversing it. If the provision substituting a different punishment had been constitutionally valid, there was still no reason for reversing the judgment, for the governor and sheriff could have executed the writ of the legislature, and it was the design of the act that it should be executed by those officers in the case of a conviction and sentence which remained unexecuted when the act of 1860 passed, without any further resort to the courts. The judgment of reversal, even independently of the reasons given, necessarily affirmed that she could not be punished under either of these legal provisions, and as there were no other modes of punishment, it followed that she could not be punished in any way. The formal order for new trial, if it meant a new trial for the murder, upon the issue which had been

once tried and determined, would have been plainly incon-
sistent with judgment of reversal, as well as with the rea-
sons upon which it proceeded.   If it had been understood
as a mandate to the oyer and terminer to proceed with the
case in accordance with the principles established by the
judgment of reversal, the discharge of the prisoner might
have been ordered by that court without a further trial,
the facts involved being contained in the record.   Enough
appears in the case, as now presented, to show that the
award of a new trial was improvidently entered, and the
whole case being legitimately before us, on this writ of
error, we are bound to give effect to the law as it has been
pronounced, and we accordingly reverse the judgment of
the supreme court, and affirm that of the oyer and termi-
ner, and direct the prisoner to be discharged.

   EMOTT, J., delivered an opinion, in which he examined
at length the question whether it was necessary that a
judgment should have passed, to support a plea of *autre
fois convict*—which was discussed in the Shepherd case.
The learned judge had not seen the opinion in that case,
but arrived at the same conclusion as Mr. Justice SUTHER-
LAND had done.   He also concurred in the opinion of Judge
SUTHERLAND, that such a reversal as that in this case does
not impair the right to plead the former conviction in bar.
" The reversal in this court of the former judgment in
this case is strongly analogous to the result of praying
benefit of clergy in England in its consequences.   This fact
remains notwithstanding that this prisoner has been tried,
convicted and sentenced without error in the process, in-
dictment, pleadings or trial.   As this appears from the
record itself, I have no hesitation in saying that the repli-
cations were no answer to the pleas."

   Judge EMOTT declined to consider the effect of the repeal
of the statute of 1860, and the passage of that of 1861, as
necessary to his determination that the judgment should
be affirmed.      .            . All the judges concurred.