# WHEELING.

## STATE v. DAVIS.

*(Absent, GREEN, JUDGE.)

Submitted June 8, 1888.—Decided June 30, 1888.

1. JURIES AND JURORS—DISCHARGE OF JUROR—DISCRETION OF TRIAL COURT.

It is within the sound discretion of the court in the trial of a felony case, if a juror at any time after he is sworn and before verdict, becomes from any cause unable to discharge his duties as such juror, to discharge such juror and substitute another qualified juror in his place; and when such substitution is made, the trial shall proceed, just as if it had then commenced before a new jury. (p. 397.)

2. JURIES AND JURORS—WHEN DISCHARGE IS PROPER.

Where, after the greater part of the evidence had been heard in a felony case, the information was imparted to one of the jurors that his son had just died, and the court certified that it " appeared to the satisfaction of the court that the juror, by reason of his affliction, was unable to discharge his duties as a juror," and discharged the juror at his request, Held: A necessity for the discharge of the juror existed, and he was properly discharged. (p. 399.)

3. JURIES AND JURORS—DISCHARGE OF JUROR—SUBSTITUTION.

After such discharge another qualified juror was substituted, and the trial proceeded de novo, and the prisoner was convicted, and moved for his discharge on that ground, which motion was overruled, and the prisoner sentenced. Held.—No error; also that it was no ground for a new trial. (p. 399.)

4. JURIES AND JURORS—VERDICT—CRIMINAL PRACTICE.

Where, upon a trial for malicious cutting with intent to kill, the jury find " the defendant not guilty as charged in the indictment, but find the defendant guilty of unlawful cutting," it is proper for the prosecuting attorney to put such verdict in proper form, finding the defendant not guilty of maliciously but of unlawfully doing the act charged in the indictment; and when, after the verdict is so written and read, on the jury being polled, one juror dissents from the verdict so written, it is proper for the court to direct the jury to return to their room to further consider of their verdict, and, when

*On account of illness.

the jury render the same verdict, there is no error in entering judgment on such verdict. (p. 403.)

5. CONSTITUTIONAL LAW.

Section 22 of chapter 152 of the Code, authorizing the court to fix the punishment when a prisoner has been found guilty of a felony, is constitutional. (p. 406.)

6. APPEAL—REVIEW—SUFFICIENCY OF EVIDENCE.

The second point in the syllabus in *Flanagan's Case*, 26 W. Va. 116, reaffirmed. (p. 405.)

*G. Loomis, R. H. Freer* and *T. E. Davis* for plaintiff in error.

*Attorney-General Alfred Caldwell* for the State.

JOHNSON, PRESIDENT :

On the 20th day of February, 1888, William Davis was, in the Circuit Court of Ritchie county, indicted for maliciously, etc., stabbing one· Creed Wilson, with intent to maim, disfigure, disable, and kill him. The prisoner moved to quash the indictment, which motion was overruled, and the prisoner pleaded not guilty. The jury was sworn on the 24th day of February to try the issue. It appears from an order entered on the next day that "it appearing to the court that Peter G. Six, a juror, is unable to perform his duty, George W. Hammer, a qualified juror, was selected, tried, and sworn in his place," etc. The prisoner objected to the swearing of a new juror, which objection was overruled. The trial proceeded from day to day until the 1st day of March, 1888, when the jury rendered the following verdict : " We, the jury, find the defendant not guilty as charged in the within indictment, but we find the defendant guilty of unlawful cutting." The court directed the verdict to be put in proper form, and the prosecuting attorney put the verdict in the usual form where the jury, in such cases, find the defendant not guilty of doing the act " maliciously," but of doing it " unlawfully."

The prisoner moved the court to discharge him, because he had not been tried before a proper jury. He also moved in arrest of judgment, and also for a new trial; which several motions were respectively overruled, and the court pronounced judgment on the verdict, and sentenced the pris-

oner to confinement in the penitentiary for the term of two years.

Upon the trial the prisoner saved seven several bills of exceptions. The one designated " O " certifies all the evidence. 1 was to the discharge of the juror Six, and the substitution of Hammer in his place. 2 was to giving to the jury the evidence of the same witnesses who had been examined before the juror Six was discharged. 3 was to the overruling the motion to exclude the evidence for the State. 4 was to the permission to read from the stenographer's notes to the jury, after the substituted juror was sworn, certain portions of the evidence given by J. M. Davis,--a witness for the prisoner, before Hammer was substituted for Six. 5 was to the putting the verdict in form by the direction of the court. 6 to the refusal to set aside the verdict and grant a new trial on the additional ground stated in this exception.

To the judgment the prisoner obtained a writ of error, and assigns twelve errors committed, as he alleges, by the court, during the trial. The first two may be considered together. They are, in substance, as follows : " The court erred in discharging the juror Peter G. Six, and in substituting G. W. Hammer in his place, and also in directing the trial to proceed without re-swearing the other eleven jurors." The right of trial by jury is regarded as sacred, and by the courts has been jealously guarded. It was in England secured by *magna charta*, and in this country by the Constitution of the United States, and of all the States. It is by all the authorities agreed that, when a prisoner is once put upon his trial for a crime before a jury, he is entitled to a verdict from that jury, unless there exists a manifest necessity for its discharge before the verdict is rendered.

Many of the authorities hold that as soon as the jury have charge of his case, upon a valid indictment, before a competent court, he is in jeopardy, and stands upon his deliverance; and, if the jury is improperly and illegally discharged, such improper discharge of the jury is equivalent to the acquittal of the prisoner, and the prisoner is therefore entitled to his discharge from further prosecution. *McCreary* v. *Com.*, 29 Pa. St. 323; *Com.* v. *Fells*, 9 Leigh 613; *Wil-*

*liams* v. *Com.*, 2 Grat. 568; *State* v. *Garrigues*, 1 Hayw. (N. C.) 241; *Spier's Case*, 1 Dev. 491; *State* v. *McGimsey*, 80 N. C. 377; *Mahala* v. *State*, 10 Yerg. 532; *Ned* v. *State*, 7 Port. (Ala.) 188; *People* v. *Webb*, 38 Cal. 467; *People* v. *Huncke-ler*, 48 Cal. 331; *State* v. *Walker*, 26 Ind. 346; *Shaffer* v. *State*, 27 Ind. 131; *Com.* v. *Cook*, 6 Serg. & R. 577.

It has, on the other hand, been frequently held that a prisoner has not been put in jeopardy, until he has been tried in a competent court by a jury upon an issue on a valid indictment, a verdict rendered, and a judgment entered. *U. S.* v. *Haskell*, 4 Wash. C. C. 409; *U. S.* v. *Gibert*, 2 Sum. 19; *U. S.* v. *Coolidge*, 2 Gall. 364; *U. S.* v. *Shoemaker*, 2 McLean 114; *U. S.* v. *Perez*, 9 Wheat. 579; *Com.* v. *Bowden*, 9 Mass. 494; *Com.* v. *Purchase*, 2 Pick. 521; *People* v. *Olcott*, 2 Johns. Cas. 301; *People* v. *Goodwin*, 18 Johns. 187; *Shepherd* v. *People*, 29 N. Y. 406; *Hartung* v. *People*, 26 N. Y. 167; *People* v. *Reagle*, 60 Barb. 527; *McKenzie* v. *State*, 26 Ark. 334; *Hoffman* v. *State*, 20 Md. 425; *Price* v. *State*, 36 Miss. 533; *Stone* v. *People*, 2 Scam. 326; *State* v. *Redman*, 17 Iowa 329; *State* v. *Vaughan*, 29 Iowa 286.

From the view we take of this case, it will be unnecessary to decide this question here, although all the text-writers, so far as we have examined, class Virginia with the authorities holding that an improper exercise of the discretion to discharge a jury in a felony-case is equivalent to an acquittal of the prisoner, and this Court might feel itself bound by those decisions.

In 2 Hawk. P. C. 622, it was said that "it seems to have been anciently an uncontroverted rule, and has been allowed even by those of the contrary opinion, to have been the general tradition of the law, that a jury sworn and charged in a capital case can not be discharged (without the prisoner's consent) till they have given a verdict. And notwithstanding some authorities to the contrary in the reign of King Charles the second, this has been holden for clear law both in the reign of King James the second, and since the revolution."

In the *Case of Kinloch*, Fost. Cr. Law 16, which was a capital case, Mr. Justice Foster says (pages 31, 32): "It seems that an opinion did once prevail that a jury once sworn and charged, in any criminal case whatsoever, could

not be discharged without giving a verdict; and this opinion is exploded in *Ferrar's Case* (Ld. Raym. 84); and it is there called a ' common tradition ' which has been held by many learned in the law. My Lord Coke was one of those learned men who gave in to this tradition, as far at least as concerneth capital cases, and he layeth down the rule in very general terms in the passages which have been cited on behalf of the prisoners from his first and third Institutes."

In *Rex* v. *Edwards*, 3 Camp. 207, it appeared that one of the jurors in a capital case having fallen down in a fit, and having been carried out of court insensible, upon being convinced that the juror would be unable to return to his duty, although evidence had been received, Baron Wood, who tried the case, discharged the eleven remaining jurors against the objection of the prisoner. The names of the eleven were again called over, and a twelfth was put into the box. The prisoner was desired, if he would, to challenge them as they came to the book to be sworn. They were all sworn without challenge. The officers charged them with the prisoner in the common form. The witnesses for the crown were sworn anew; and, by consent, the evidence they had before given was read from the judge's notes, and they were asked whether it was true. The prisoner was convicted. At the following Easter term, in the exchequer-chamber, the point that the prisoner was not properly tried by the second jury was argued by counsel for the prisoner before eleven of the twelve judges, who, without hearing the other side, held the conviction right.

In the notes to this case, mention is made of two old cases: *Rex* v. *Scalbert*, Leach 620, where it appeared that the prisoner was tried for murder, in the year 1794, before Mr. Justice Lawrence, the only judge absent from the exchequer-chamber at the hearing of the case of *Rex* v. *Edwards*. During the trial, one of the jurymen was seized with a fit, and carried out of court insensible. On evidence that he was unable to return, the learned judge discharged the jury, and ordered another to be sworn. The prisoner was convicted and executed. Also the case of *Rex* v. *Stevenson*, Leach 546, where, the prisoner himself falling down in a fit, during the trial, the jury was discharged. Upon recovery

he was tried and convicted by another jury. In the case of *Queen* v. *Beere*, 2 Moody & R. 472, which was tried in 1843, the prisoner was indicted for felony. After the evidence for the prosecution had been partly gone through, a juror was taken with a fit, and carried from the box. The same course was pursued as in *Rex* v. *Edwards*, and the prisoner was convicted.

Upshur, Judge, in delivering the opinion of the court in *Fell's Case*, 9 Leigh 617, said, after reviewing a number of English and American cases: "One general rule is deducible from all the cases, which is that the court may discharge the jury whenever a necessity for so doing shall arise; but what facts and circumstances shall be considered as constituting such a necessity can not be reduced to any general rule. The power to discharge is a discretionary power, which the court, as in all other cases of judicial discretion, must exercise soundly according to the circumstances of the case. The object of the law is to obtain a fair and just verdict, and, whenever it shall appear to the court that the jury impaneled can not render such a verdict, it ought to be discharged and another jury impaneled. This is emphatically the case of necessity contemplated in the authorities we have referred to; as where the prisoner became too sick to attend to his defence or one of the jury was rendered physically unable to discharge his duty. There are other cases of necessity equally strong, one of which probably is where a juror, from the peculiar condition of his mind and feelings, is manifestly disqualified from bestowing upon the case that attention and impartial consideration which is necessary to a just verdict. * * * The actual sickness of a juror, and his consequent inability to discharge his duty, is admitted on all hands to present such a necessity. In the case before us, the juror was not actually sick, but there was every reason to believe that he would become so through longer confinement. Was the court bound to wait till the case actually occurred? We think not. * * * A necessity not less strong was presented by the situation of the wife of another juror. If the object of the trial be, as it undoubtedly is, to obtain a fair, just and impartial verdict, there can be but little prospect of such a result from the con-

strained and reluctant action of minds wholly absorbed in the deep and peculiar interest of their domestic relations." It was held that it would be improper, under such circumstances, to discharge the prisoner.

Now, what are the circumstances appearing in this record? After the jury, on the 24th of February, had been adjourned to the next day, it was communicated to the sheriff in charge of the jury that a son of the juror Peter G. Six had just died. On the next morning the sheriff took the jury to the box, their names were called, and they all answered. The court was informed by the sheriff that he (the sheriff) "had received a dispatch or message for Peter G. Six, one of the jurors aforesaid, announcing the death, on the preceding night, of a son of said juror. The sheriff was then directed by the court to retire with the said Peter G. Six to the jury-room and communicate said information to him, which was accordingly done. The sheriff and said juror Peter G. Six then returned to the bar of the court; and it appearing to the satisfaction of the court that the said juror Peter G. Six was unable to perform his duty as such juror, by reason of his affliction, said Peter G. Six was, at his request at the bar of the court, discharged by the court from further service as such juror in this case; the prisoner not consenting thereto either in person or by counsel. The court thereupon directed the sheriff to summon another qualified juror, which was accordingly done, and one G. W. Hammer was called, examined, tried and sworn as a juror to serve in the room and place of the said Peter G. Six, discharged as aforesaid. The prisoner was tendered his right of challenge to said juror G. W. Hammer before he was sworn as such, and stated that he had no objection to him personally, but objected and most solemnly protested against the said Hammer being sworn to take the place of the said Peter G. Six, discharged; which objection, being argued by counsel and considered by the court, was overruled, and the said G. W. Hammer was sworn as such juror as aforesaid, and the court ordered the trial to proceed; to which order of the court directing the trial to proceed, the prisoner objected, and his objection was by the court overruled, and the trial proceeded accordingly without the eleven jurors impaneled on the first day of trial being re-sworn;

to which several rulings and order the prisoner excepted," etc.

Here it appears from the record that the juror, Six, was informed that his son had just died. It would, indeed, be a stout-hearted father who could, unmoved, receive news of the death of a child. Some men could receive such news and proceed with their work with steady nerve and mind clear and strong; but observation teaches us, if, indeed, we have not learned from sad experience, that the natural result of information, suddenly imparted to a father, of the death of a child, is to unfit him, for the time, to attend to business. It would have been cruel to have required the juror to remain on the jury under such circumstances. His grief would naturally unfit him for the discharge of such an important duty. And if, as the court said in *Fell's Case*, the object of the trial is to obtain a fair, just and impartial verdict, there could be little prospect of it under such circumstances. This is one of the cases spoken of in the opinion in that case, where a juror is, from the peculiar condition of his mind and feelings, manifestly disqualified from bestowing on the case that attention and impartial consideration which is necessary to a just verdict. This, we say, would be the natural result of being plunged into such domestic grief.

But here the court certifies that it appeared to its satisfaction that the juror was unable, by reason of his affliction, to perform his duty as a juror. If this was disputed, the defendant ought to have had the bill of exceptions to show a different state of facts. But it is here argued by counsel for plaintiff in error that the record does not show that the information was true; does not show that the son of the juror was in fact dead. This does not change the case in the least. The question is not whether the information was true or false, but what was the mental condition of the juror? Was he competent to go on in the discharge of his duties as a juror? The record shows he was not. It shows that he was so overcome by his grief that he was unable to discharge his duties as a juror.

The statute says—and it is in perfect accord with the principles of the common-law—that if a juror, after he is sworn, be unable from any cause to perform his duty, the court

may, in its discretion, cause another qualified juror to be sworn in his place. Code, ch. 159, § 7. The statute (same section) further provides that "in any criminal case the court may discharge the jury when it appears that they can not agree on a verdict, or that there is manifest necessity for such discharge." If the judge was disqualified to proceed with the trial, or the prisoner himself, then there would be manifest necessity to discharge the whole jury; but if a juror was unable, through sickness, mental trouble, or otherwise, to discharge his duty as a juror, then, says the statute, it is unnecessary to discharge the whole jury, but the disabled juror may be discharged, and another qualified juror sworn to take his place. This statute does not abridge the right of the citizen secured to him by the constitution.

In the language of Smith, Judge, in *Stone* v. *People*, 2 Scam. 337, we ask: " Why is a court, for the ends of justice, and where manifest necessity exists for the act, authorized to discharge a jury? And if the whole jury may, in such case, be discharged, why not set aside a person improperly selected and sworn? No injustice has been done; no law has been violated. The rights of the prisoner have not been infringed. The course is agreeable to justice; and we can see no wrong in the mode adopted." " If a doubt, however, could exist," said the judge in that case, " it is definitely and conclusively settled by the eleventh section of the act referred to relative to jurors: ' In case of death, sickness, or non-attendance of any grand or petit juror, after he shall have been sworn upon the jury, or when any such juror, as aforesaid, after being sworn as aforesaid, shall, for any reasonable cause, be dismissed or discharged, it shall be lawful for the court to cause others, if necessary, to be summoned and sworn in his or their stead.' " In that case the prisoner, Stone, was indicted for murder. After the trial had commenced, and a part of the witnesses had been examined, it was discovered that an alien was on the jury. The prosecuting attorney, learning the fact, of which both he and the court were ignorant, moved that the juror be withdrawn and discharged, and a new juror be sworn in his place, which motion was granted, against the objection of the prisoner. The trial proceeded. The prisoner was found guilty. He

moved for a new trial and in arrest of judgment, which motions the court overruled, and passed sentence of death. On writ of error it was held that the proceedings were regular, and the overruling of the motion of the prisoner to discharge the other eleven jurors was not error. The judgment was therefore affirmed.

Both on principle and authority, the court, in this case, did not err in discharging the juror Six, for the reason shown by the record, because a manifest necessity existed therefor. Neither did the court err in ordering the trial to proceed with the jury as constituted after the substitution of the juror Hammer for Six, as he had had his legal challenge to the original jurors and to the substituted juror. Every right guarantied to him by the constitution was granted him. Neither did the court err in permitting the witnesses again to be examined before the jury after Hammer was sworn. We can not see where the prisoner was denied any right of trial by jury. So long as the Legislature is within the limits prescribed by the constitution, it may make any regulation which to it seems proper as to the impaneling of a jury to try persons for offences. It has, in this particular instance, said that the course here pursued was authorized, and no constitutional right has been infringed in constituting the jury as it was constituted in this case.

From what has been said it is clear the court did not err in refusing to discharge the prisoner. Neither did the court err in refusing a new trial on the ground that the jury was improperly impaneled. The prisoner was not prejudiced by the fact that the juror Hammer had not heard every thing that the other jurors heard. When the substituted juror was sworn, the trial commenced *de novo*. Then the prosecuting attorney introduced the evidence just as if the jury was entirely different from what it was before, and the defence, of course, had the right to bring forward all the evidence it could. We can not perceive how the prisoner was prejudiced by this. Certainly, nothing appears in the record to his prejudice in this respect. The court did not, therefore, err in refusing to exclude the evidence of the State.

It is also assigned as error that the court permitted the

stenographer's notes to be read to show, if they would, that J. M. Davis, the father of the prisoner, had made a different statement, as to one matter, before the jury before the substitution of Hammer, from that made in his first examination before the juror Six was discharged. The bill of exceptions shows that, after all the evidence had been introduced, and the opening argument for the State had been concluded, and the argument on behalf of the prisoner had also been concluded, the prosecuting attorney offered to read from the transcript of the short-hand notes of the stenographer the testimony of J. M. Davis on a certain matter, which transcript is as follows:

"FRIDAY, February 24, 1888.

" Question—State whether you examined the marks on his person from that whipping.

"Answer—Yes, sir; I did some days afterwards, but I did not just examine them at that time,—that evening. If my recollection serves me, I think it was a day or so afterwards."

Also, in connection therewith, the following cross-examination of the said James M. Davis, taken from said stenographer's record of the examination of said Davis on February 24, 1888:

" Question—Did you hear of the circumstances of William Davis having been whipped on the 5th day of December, the day before the cutting took place?

"Answer—Yes, sir; I did that evening, when he came home.

" Question—Did you examine where he had been withed?

"Answer—Yes, sir.

" Question—Were you not sworn on last Friday, and did you not testify as a witness in this same case?

"Answer—I believe I was.

" Question—Did you not state, at that time, it was two or three days after the whipping of the 5th that you examined those welts?

"Answer—I had examined those welts in two or three days afterwards.

" Question—Two, three, five, or six days after?

"Answer—Two.

" Question—Why didn't you state, on Friday of last week, in describing those welts, that you examined them on the evening of the 5th, instead of stating that you examined them three, four, or five days afterwards?

"Answer—I was not asked the question 'four or five days afterwards?'"

Which examination, on Friday, the 24th day of February, 1888, had not been heard by G. W. Hammer, the juror substituted for Peter G. Six, discharged as set forth in bill of exceptions No. 1, and made part thereof; and then to argue therefrom a contradiction in the two statements so made by the witness, J. M. Davis,—the one to the jury while Six was a member, and the other to the jury of which Hammer was a member in the place of Six, discharged.

Thereupon the prisoner objected to the reading of so much of the evidence herein given of the testimony given by said Davis to the jury when said Hammer was not one of the panel, and he also objected to the prosecuting attorney being allowed to comment on the testimony herein set forth, and endeavor to show a conflict between the two statements. The court overruled the objections, and permitted the prosecuting attorney to read the evidence to the jury, and comment thereon, which he did, and the prisoner excepted.

From this bill of exceptions, I take it that the testimony here objected to was before the jury. It certainly might properly have been there. The foundation had been laid to contradict the witness; and, if the contradictory statement had been contained in a deposition before a justice, it would have been admissible. Certainly, then, it was admissible if made in another trial of the same case, and preserved in the official stenographer's notes. We see no objection to the reading of it to the jury, and the comment thereon. Again, it could not have prejudiced the prisoner, because there was no contradiction in the two statements of the witness Davis. He did not say, in either examination, that he examined the limbs of the prisoner on the evening the whipping was done.

Bill of exceptions No. 6 shows no error. The attorney who opened the argument for the State " insisted that the accused was either guilty of the malicious cutting charged or

51

nothing." The prosecuting attorney, in closing, said that was his opinion also; "but that the jury must not take the statements or opinions of counsel, but must act for themselves." The prisoner insists that by these statements the jury may have been misled in returning a verdict against the accused for a higher grade of offence than they intended, and asked that the verdict might be set aside on that ground; which motion was overruled, and the prisoner excepted. There is no error to be found in this bill of exceptions. The attorneys had perfect right to insist that, if the prisoner was guilty at all, it was of the highest offence charged. This could certainly not prejudice the prisoner; for it was, in effect, saying to the jury: "If the State has not shown the prisoner guilty of the highest offence charged, then he ought to be acquitted."

The fourth error assigned is to certain rulings made by the court during the trial as to the admission or refusal to admit evidence. The first four objections were to the refusal to admit certain evidence which was offered to the jury before Six was discharged, and therefore could not have prejudiced the prisoner. The following question, on cross-examination, was asked of Creed Wilson, the prosecuting witness : " Have you given the same testimony this afternoon as you did before?" Objected to by State, sustained, and exception by defendant. The court did not err in sustaining the objection. The question was too general. It would be unfair to the witness to require it to be answered. This question was also asked of the same witness on cross-examination : " Is there one juror on the jury who was not a member of the jury on yesterday?" And also this: " Is the jury as now constituted the same that it was on yesterday, when you testified touching these facts?" To both questions the State objected, which objections were sustained, and the prisoner excepted. The court did not err in sustaining either of these objections. That was no legal manner in which to prove the fact that there had been a change in the jury. That must be proved by the record.

The counsel for defendant had been trying to show, by the prosecuting witness, how hard he had whipped the prisoner and three other boys on the day before the cutting,

and the witness said, in answer to a question : "Of course, you could raise a welt on a boy if his clothes were thin easier than you could if he had thick clothes on." The question was asked : "Will you give us an example of an offence sufficiently great, in your estimation, to justify a teacher in threshing a boy so as to raise welts on his person, as referred to ?" "Answer—Well, sir, I do not think I raised any welts on him." "Question—I did not ask you whether you did. Please answer my question." The question was then repeated, and the State objected, and the objection was sustained, and the prisoner excepted. The court committed no error in sustaining the objection. The witness was not an expert, nor being examined as such. It was improper to ask him to give an example of any offence which would justify severe castigation. That was not the issue. The question was whether the plaintiff was guilty as charged, and such evidence could throw no light on the issue.

The witness was then asked : "Do you think the offence for which he was punished on that day was sufficiently grave to justify a teacher in whipping him with a withe, as already described, sufficiently severe to raise marks and welts on his person, and discolor his flesh thereby ?" Objection made and sustained, and prisoner excepted. The objection was properly sustained for reasons already stated, and because it was improper to ask him as to the exact amount of corporal punishment that should be inflicted for specific offences committed by scholars in school, or to ask him what he would regard as severe or moderate punishment.

The fifth bill of exceptions is to the court directing the verdict to be put in form. The verdict, as first rendered, was : "We, the jury, find the defendant not guilty as charged in the indictment, but we find the said defendant guilty of unlawful cutting." The court directed the attorney for the State to put the verdict in proper form. It was written by the attorney as follows : "We, the jury, find the defendant, William Davis, not guilty of maliciously cutting, stabbing, and wounding Creed Wilson, as charged in the within indictment, but we do find him guilty of unlawfully cutting, stabbing, and wounding the said Creed Wilson, with intent, and by means whereof, to maim, disfigure, disable,

and kill him, the said Creed Wilson." One of the jurors signed the verdict, and, as so written, it was read over to the jury, and the prisoner objected to the same, alleging that the verdict so written found the prisoner guilty of a higher grade of offence than he had been found by the jury themselves. The court then directed the words, "and by means thereof," to be stricken out, which was done; and the verdict, thus amended, was read to the jury by the clerk, who propounded the question : "Gentlemen of the jury, is this your verdict?" And thereupon the prisoner asked that the jury be polled, which was accordingly done, and one or more of the jurors dissented therefrom. The court then directed the jury to retire to their room to consider further of their verdict, and after some time they returned into court, and were inquired of if they had agreed upon a verdict, to which they responded in the affirmative, and handed the clerk the indictment, with the verdict unchanged, in all respects, as written out and amended and signed, as aforesaid; and the jury was again polled, and each inquired of, "Is this your verdict?" and each responded, "It is ;" whereupon the jury was discharged.   Was there any error in this?

The usual practice is, upon the foreman making his response to the question, "Gentlemen of the jury, have you agreed upon a verdict?" the clerk takes the indictment from him, and reads aloud the verdict as it is written on the indictment. Then is the time to put the verdict in proper form, which the clerk or attorney usually does, under the direction of the court.   3 Rob. (Old) Pr. 262.   It seems to us the action here was entirely regular.   It was manifest from the verdict returned that the jury intended to find the prisoner not guilty of maliciously doing the act charged in the indictment, but of unlawfully doing the act with the intent charged.   Under the direction of the court, it was put in proper form to show that they so found.   Upon the polling of the jury, one or more of them dissented from the verdict. What was the court to do ?   Should it have decided that the jury, by the informal verdict rendered, intended to find the defendant guilty of a misdemeanor merely ?   He did the only proper thing to be done,—directed them to retire, and further consider of their verdict.   There was not one word

said calculated to influence them in the verdict they should render. If they had been so disposed when they retired, they could have found the prisoner not guilty. There was nothing done in this matter to the prejudice of the prisoner. Woodfall's celebrated case (5 Burrows, 2,661) is not applicable. Woodfall was indicted for libel in publishing Junius' letters. The jury found him "guilty of printing and publishing only." The verdict was received in this form, and the jury discharged. The question was what judgment could be entered on verdict. Could the court pronounce on said verdict judgment for maliciously publishing, etc.? "Only" was the controlling word, and the court held that judgment for maliciously doing the act could not be entered on the verdict.

It is also assigned as error that the court refused to set aside the verdict, because it was contrary to the evidence. The law is firmly settled that, upon a writ of error to a judgment overruling a motion to set aside a verdict, and to grant a new trial, on the ground that the verdict was contrary to the evidence, and the evidence, and not the facts proved, is certified in the bill of exceptions, the appellate court will not reverse the judgment, unless, after rejecting all the conflicting parol evidence of the exceptor, and giving full faith and credit to that of the adverse party, the decision of the trial court still appears to be wrong. This rule has often been affirmed in this State. *State* v. *Flanagan*, 26 W. Va. 116.

Tested by this rule, how stands this exception? It appears that on the 5th of December, 1887, the teacher had, with a hickory withe, whipped the prisoner and three other boys for violating a rule of the school against whispering. The withe was about a half inch in diameter at the butt, and terminated at a point at the other end, and was between three and four feet long. That evening the prisoner told Miss Kate Wells, one of the scholars, if Creed Wilson, the teacher, "ever went to whip him again he would kill him." On the next morning, while the teacher, Wilson, was ringing the bell to call the school, the prisoner came to him, and said, if he did not whip a boy by the name of Ellifritz, he would kick him (the boy). The teacher told Davis that, if he and

Mr. Ellifritz had any trouble to settle, it would be better to settle it somewhere else. Davis told the teacher the reason he was going to kick Ellifritz was that he had sent him a message calling him a bad name. The teacher told him he would see about it when school took up. He (the teacher) then went to Ellifritz, and asked him if he had sent Davis that message, and he said he had. . He asked him why he did it; and he said because Davis, the evening before, in school, had called him the same bad name. Then the teacher asked Davis if he had done that, and he said he had not, but had called him a d——d snipe, or something similar. The teacher then sent out for a couple of withes, and he put them by. He then went on with the recitations until time for recess, and then called the two boys out on the floor. Ellifritz came, and Davis still sat in his seat. The teacher told Davis the second time to come, and he answered that " he would not that any one knew of." He then, with a withe similar to the one used the day before, walked to Davis, and took hold of his left shoulder with his right hand; and, just as he took hold of him, he (Davis) rose with a knife in his hand, and struck the teacher with the knife near one eye, and drew the knife across his forehead, to the opposite side of the head, and almost severed an ear, inflicting a fearful wound. The teacher tried to evade the blow by stooping, and it struck him higher than it otherwise would. He then inflicted a wound with the knife on the top of the teacher's head. This is all the evidence necessary to state. The jury were certainly well warranted in finding as severe a verdict as they did. If it had been for maliciously cutting with intent to kill, under the rules we have laid down, we could not disturb it.

The last error assigned is that section 22 of chapter 152 of the Code, as amended in 1882, authorizing the court to fix the punishment when a jury has found the prisoner guilty of felony, is unconstitutional, and in contravention of that time-honored declaration in the bill of rights, that "no person shall be deprived of life, liberty, or property without due process of law and the judgment of his peers." This is a provision taken from *magna charta*, except in that instrument it reads "or the judgment of his peers." This word

"and," instead of "or," was evidently put in our Constitution of 1872 by inadvertence; and, to make it harmonize with other portions of the same instrument, must be construed as meaning "or." If this were not so, courts of chancery would, in effect, be abolished. So construing it, then the provision means just what it did in *magna charta*, and it was put into our Constitution with the same meaning it had there. Its meaning has been firmly settled in England, and the constitutions of the States adopted it with the construction there put upon it.

In criminal trials in England no court in felony cases, after the great charter was signed, ever attempted to pronounce a prisoner guilty without the intervention of a jury. In 2 Hawk. P. C. 623, we find "that it had been adjudged that, where the jury find a man not guilty of an indictment or appeal of murder, they are not bound to make any inquiry whether he be guilty of manslaughter, etc.; but, if they will, they may, according to the nature of the evidence, find him guilty of manslaughter or homicide *se defendendo* or *per infortunium;* for the killing is the substance, and the malice but a circumstance,—a variance as to which hurts not the verdict. Yet the books seem to make this difference: that where the jury find the defendant guilty of manslaughter on an indictment for murder, they may give their verdict generally, without setting out any of the circumstances of the fact; but that they shall not be received to find him guilty generally of homicide *defendo* or *per infortunium*, but must set out the whole circumstances of the fact, and in the conclusion show of what crime they find the defendant guilty; wherein, if they be mistaken, it is said that the court may notwithstanding, give such judgment as shall appear to be proper from the circumstances of the fact specially set forth." The following among other old authorities are cited: *Worth* v. *Wiggs*, Cro. Eliz. 276; *Turner* v. *Musgrave*, Dyer 261; *Hudson* v. *Lee*, 4 Coke 43; *Gore's Case*, 9 Coke 81; *Bold* v. *Molineux*, Dyer 14; *Matters of the Crown*, Plow. 101; 2 Hale P. C. 302.

Hawkins, (2 P. C., ch. 48, § 3) further says: The settled judgment at this day against a man for high treason, not re-

lating to the coin, seems to be that he shall be carried back to the place from whence he came, and from thence be drawn to the place of execution, and there be hanged by the neck, and cut down alive, and his entrails be taken out, and burnt before his face, and his head cut off, and his body be divided into four quarters, and his head and quarters disposed of at the king's pleasure."

Hawkins also says: "As to judgments by express sentence, which are discretionary and variable according to different circumstances, I shall observe, in general, that for crimes of an infamous nature, such as petit larceny, perjury, or forgery at common law, gross cheats, conspiracy not requiring a villainous judgment, keeping a bawdy-house, bribing witnesses to stifle their evidence, and offences of like nature against the first principles of natural justice and common honesty, it seems to be, in a great measure, left to the prudence of the court to inflict such corporal punishment, and also such fine, and lien to the good behavior for a certain time, etc., as shall seem most proper and adequate to the offence, from the consideration of the baseness, enormity, and dangerous tendency of it; the malice, deliberation and willfulness, or the inconsideration, suddenness, and surprise, with which it was committed; the age, quality, and degree of the offender; and all other circumstances which may in any way aggravate or extenuate the guilt." 2 P. C., ch. 48, § 14. Among other authorities, citing *Ramsey's Case*, 3 State Tr. 487; *Spicer* v. *Read*, Hob. 62; *Lady Newman's Case*, 3 Leon. 170; *Leefer's Case*, Cor. Jac. 498.

Says Chitty: "It may be laid down as a general rule that all those offences which exist at common-law, and have not been regulated by any statute, are within the discretion of the court to punish." 1 Chit. Crim. Law 710. Mr. Chitty further says: "Another large class of offences in the punishment of which much is left to the wisdom of the court, arise from clergyable felonies. We have already shown how the ceremony of purgation was abolished, how that burning in the hand was substituted in its room, and how other penalties of imprisonment, transportation and corporal punishment have been established in the place of the latter. At the present day, the judge, by the provisions of several

statutes, may order the offender to be publicly or privately whipped, exposed in the stocks, fined, imprisoned for two or transported for seven years to his majesty's colonies. And by 53 Geo. III, ch. 162, it shall be lawful for any court to pass upon any person convicted, before such court, of felony with benefit of clergy, or of any grand or petit larceny, the sentence of imprisonment to hard labor, either simply and alone, or, in addition, to any other sentence which such court shall be authorized by law to pass," etc.   Chit. Crim. Law 709, 710.

Thus it is clear that in England, after *magna charta*, it never was supposed that that instrument, in securing a right to jury trial, affected the punishment to be inflicted.   It was the province of the jury to find the guilt or innocence of the accused of the offence charged in the indictment. The judges, in many cases, merely pronounced the sentence the law imposed, upon the jury rendering a verdict of guilty ; and in many cases the statute gave a discretion, as the common-law did in others, to impose a penalty, within certain limits, commensurate with the offence.   Then there, as here now, the jury should convict of the offence, and the court the penalty or punishment.   It is true that in Virginia the general assembly, in 1786, authorized the jury to assess a fine in misdemeanor cases; and in 1796 passed the act authorizing the jury to fix the term of imprisonment in the penitentiary.   1 Rev. Code, 1816, 48, 169, p. 612$n$; 1d. note to section 12, p. 919.

The bill of rights in the constitution of Virginia of 1779 declared that "no man shall be deprived of his liberty except by the law of the land, or the judgment of his peers." Under this bill of rights, the jury convicted of the offence, and the court fixed the punishment, until afterwards changed by statute.   The punishment, after a conviction of the offence by a jury, has always been within the power of the legislature, under the constitution securing right of trial by jury.

The act of 1882, taking away the right of the jury to fix the punishment, is clearly constitutional.   There is no error in the judgment of the Circuit Court, and it is affirmed.

AFFIRMED.