(103 So. 694)

### SPELCE et al. v. STATE. (8 Div. 138.)

(Court of Appeals of Alabama. June 30, 1924. Rehearing Denied Dec. 16, 1924.)

**1. Criminal law ⬳182—Discharge of jury without verdict and before expiration of term acquits defendant.**

Unless something has occurred, after jury were sworn, legally necessitating withdrawal of case therefrom, discharge of jury without verdict and before expiration of term acquits defendant.

**2. Criminal law ⬳184—Death of juror's mother held to require discharge of jury in murder trial.**

Where, during a murder trial, the mother of one of the jurors died, it was the duty of the trial court to discharge the jury and declare a mistrial.

**3. Criminal law ⬳994(1)—Clerk's duty to enter on minutes of court judgment intended as evidenced by bench notes.**

Where bench notes were sufficient to show, in murder prosecution, what judgment was intended to be, it was clerk's duty to enter on minutes of court judgment intended as evidenced by bench notes.

**4. Criminal law ⬳184—Defendants not placed in double jeopardy by discharge of jury on former trial without their consent.**

Defendants held not placed in double jeopardy, within Const. 1901, § 9, by discharge of jury on former trial without their consent, in view of Code 1907, § 7314, where necessity of discharging jury arose from death of mother of one of jurors.

**5. Criminal law ⬳1169(2)—Any error in overruling objection to question asked witness held harmless.**

In murder prosecution, error, if any, in overruling objection to question asked witness when deceased had bought land from one of defendants, was harmless, where deed showing date of purchase was in evidence, and it was not contended that it was not correct.

**6. Homicide ⬳169(2)—Evidence as to agreement between deceased and defendant relative to which altercation preceding killing arose held relevant.**

Where deceased was killed after altercation on premises sold to him by defendant, evidence as to agreement between defendant and decedent as to when defendant was to give up possession of premises held relevant as tending to explain presence of parties at time of difficulty, and to throw light on controversy at that time about right to possession.

**7. Criminal law ⬳1169(2)—Exclusion of testimony as to matters shown by other evidence held harmless.**

Where decedent was shot by one of defendants after altercation as to possession of premises sold to deceased, exclusion of evidence as to when first payment on premises was to be made held harmless, where deed in evidence set out dates of payments.

**8. Criminal law ⬳364(2)—Proof that nothing was said in defendants' conversation prior to homicide about trouble with decedent held inadmissible as res gestæ.**

In murder prosecution, proof that on road going to place of homicide defendants had a conversation with another, in which nothing was said about trouble with decedent, or going there to have any trouble with him, held inadmissible; such conversation not being res gestæ.

**9. Homicide ⬳169(1)—Evidence as to defendants' conversation prior to homicide about uninterested party held irrelevant.**

In murder prosecution, proof that on road going to place of difficulty defendants had a conversation with another about an uninterested party was irrelevant to any issue.

**10. Criminal law ⬳364(½)—Contemporaneous declarations, made by party setting out on journey, as to object and purpose, are admissible as res gestæ.**

Contemporaneous declarations, made by a party setting out on a journey, as to object and purpose in going, are admissible as res gestæ of act of going.

**11. Homicide ⬳156(2)—Proof that defendant did not threaten to go to decedent's house held incompetent.**

In murder prosecution, proof that defendant, in conversation on road going to decedent's place, did not make any promise, threat, or statement that he was going to decedent's house to have any difficulty or trouble with him, was incompetent.

**12. Homicide ⬳158(1)—Proof that defendant was going to look for a negro on morning of homicide held incompetent.**

In murder prosecution, proof that defendant was going to look for "that negro" on morning of homicide was incompetent; it being evidence of an uncommunicated motive.

**13. Homicide ⬳156(2)—Proof that defendant did not tell codefendant he wanted him to go down to decedent's for any purpose held incompetent.**

In murder prosecution, proof that defendant did not tell his codefendant he wanted him to go down to decedent's for any purpose held incompetent.

---

⬳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

14. **Criminal law ⊚⟹448(3)—Question held objectionable as calling for conclusion of witness.**

In murder prosecution, question "whether decedent was arranging to move house" sold him by defendants was objectionable as calling for conclusion of witness.

15. **Homicide ⊚⟹169(2)—Proof that defendant had never surrendered possession of property sold deceased held competent.**

In murder prosecution, where deceased was killed after altercation as to possession of premises sold to deceased, proof that defendant had never surrendered possession, and that he and his family had stayed in a certain house thereon sold deceased, was competent.

16. **Homicide ⊚⟹338(3)—Exclusion of proof that defendant had impediment in his leg held harmless.**

In murder prosecution, exclusion of proof that defendant had an impediment in his leg, and that he had just gotten off of crutches, *held* harmless, where he had full benefit of such testimony as to his size and physical condition in his own and testimony of physician.

17. **Criminal law ⊚⟹390—Objection held properly sustained to question calling for testimony as to an understanding.**

In murder prosecution, objection *held* properly sustained to question to defendant whether there was any "understanding" between him and his codefendant as to a right to move house sold deceased.

18. **Criminal law ⊚⟹390—Proof held immaterial and to call for uncommunicated motive.**

In murder prosecution, proof that defendant had paid in order to enable the other defendant to make a deed for property sold deceased was immaterial and called for an uncommunicated motive.

19. **Homicide ⊚⟹156(1)—Proof that defendant had been carrying pistol, and had been threatened by other parties, held incompetent.**

In murder prosecution, proof that defendant had been carrying a pistol for some time, and that he had been threatened by other parties before that, was incompetent, where evidence did not show that he was justified by such threats in carrying pistol at time and place of homicide.

20. **Homicide ⊚⟹164—Evidence as to physical condition of defendant held incompetent.**

In murder prosecution, where physician had testified that defendant was weak physically, due to getting his leg nearly cut off, evidence as to details of surgical operation, and whether defendant could eat solids or liquids, and details of his injury, was incompetent.

21. **Homicide ⊚⟹187—Evidence as to relative size of defendant and decedent and general physical condition of codefendant held competent as to self-defense.**

In murder prosecution, in which there was evidence of self-defense, proof of relative size of defendant and deceased and general physical condition of codefendant was competent as tending to show relative conditions of parties at time of homicide.

22. **Criminal law ⊚⟹388—Proof of witness' experimental observations held properly excluded, where conditions not shown to be same at time of homicide.**

In murder prosecution, proof of defendants' witness' experimental observations as to what state's witness on horseback could have seen of the difficulty, made some months after homicide, *held* properly excluded, where conditions were not shown to be same as those existing at time of homicide.

23. **Criminal law ⊚⟹334—Burden on party offering evidence of experimental observations to show similarity in essential conditions.**

Burden is on party offering evidence of experimental observations to show similarity in essential conditions with act under observation.

24. **Criminal law ⊚⟹388—Substantial similarity, with act under observation, sufficient to admit evidence of experimental observations.**

A substantial similarity, with act under observation, is sufficient to admit evidence of experimental observations.

25. **Criminal law ⊚⟹736(1)—Whether conditions substantially similar to warrant admission of evidence of experimental observations is for court.**

Whether conditions are substantially similar with act under observation to warrant admission of evidence of experimental observations is ordinarily for court to determine.

26. **Criminal law ⊚⟹1169(2)—Exclusion of evidence of witness' experimental observations at scene of homicide held harmless.**

In murder prosecution, exclusion of evidence of witness' experimental observations at scene of homicide *held* harmless, where defendants had full benefit of such testimony from other witnesses.

27. **Criminal law ⊚⟹829(1)—Refusal of requested charges covered by charges given is not error.**

Refusal of requested charges covered by charges given, or by court's oral charge, is not error.

28. **Homicide ⊚⟹300(14)—Refusal of defendant's charge relating to self-defense held not erroneous.**

In murder prosecution, refusal of defendant's charge relating to self-defense *held* not erroneous, where it pretermitted an honest belief by defendant as to whether or not deceased was about to attack him.

29. **Criminal law ⊚⟹807(1)—Argumentative charge is properly refused.**

An argumentative charge is properly refused.

30. **Criminal law ⊚⟹815(1)—Charge, not predicated on evidence, is properly refused.**

A charge, not predicated on the evidence, is properly refused.

---

⊚⟹For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**31. Criminal law ☞755—Charge invading province of jury is properly refused.**

A charge invading province of jury is properly refused.

**32. Homicide ☞300(5)—Charge relating to right to carry arms held properly refused as misleading.**

In murder prosecution, charge that a person, who has good reason to apprehend an attack, may carry a pistol on his person, even though he carries it concealed, if he carries it for defensive and not offensive purposes, was properly refused as being misleading.

**33. Criminal law ☞753(2)—General charge properly refused, where evidence conflicting.**

General charge is properly refused, where evidence is conflicting and ample to sustain conviction of crime charged.

**34. Homicide ☞342—Refusal of charges as to murder in first degree held no ground for complaint, where defendants convicted of murder in second degree.**

Refusal of general charges as to murder in first degree was no ground for complaint, where defendants were convicted of murder in second degree, which operated as an acquittal of murder in first degree.

**35. Criminal law ☞809—Instruction, relative to notice served by deceased on defendant for possession of premises sold, held properly refused as misleading.**

In murder prosecution, where difficulty arose over possession of premises sold by deceased to defendant, instruction that, if deceased served on defendant a notice demanding possession of premises sold deceased it constituted an acknowledgment by deceased that defendant was in possession of such premises at time of notice, *held* properly refused as misleading.

On Rehearing.

**36. Courts ☞116(4)—Trial judge might ex mero motu during term time amend bench notes by supplying inadvertently omitted word.**

Trial judge ex mero motu, during term time, might, without motion to amend nunc pro tunc, amend bench notes by supplying inadvertently omitted word to show reasons for granting mistrial, and may require clerk to write minutes in accordance with bench notes as amended, so as to make record speak the truth.

**37. Criminal law ☞1167(5)—Any error in court's ruling on defendant's plea of former jeopardy held harmless.**

In murder prosecution, any error in court's ruling on defendant's plea of former jeopardy, before minute entry showing mistrial in former prosecution had actually been written by clerk, *held* harmless, since, if granted another trial, defendant would be confronted by minute entry showing judge's reasons for ordering mistrial.

**38. Criminal law ☞670—Court not put in error for sustaining objection to questions unless appearing that answer would be admissible and relevant.**

Court could not be put in error for sustaining objections to questions, where it did not clearly appear that answers would be admissible and relevant, and counsel did not state facts expected to be elicited, showing their materiality.

Appeal from Circuit Court, Madison County; James E. Horton, Jr., Judge.

George Spelce and Glenn Lawler were convicted of murder in the second decree, and they appeal. Affirmed.

Certiorari denied by Supreme Court in Ex parte Spelce, 212 Ala. 559, 103 So. 705.

The following charge was given for the state:

"I charge you gentlemen of the jury that, if you are satisfied from the evidence in this case beyond a reasonable doubt that the defendants are guilty, it is your duty to convict them, although you believe it is possible they are not guilty."

These charges were refused to defendant:

"(42) A person may fight willingly if he is free from fault in bringing on the difficulty, and there is no reasonable mode of escape open to him without increasing his danger, provided he uses only such force as is necessary to defend himself against the assault made upon him, and, if the assault was felonious and such as to imperil his life, or his person, with serious harm, or reasonably appear so at the time to him, he then would be justified in killing his assailant."

"(100) I charge you gentlemen of the jury, under the laws of Alabama, where a person has a good reason to apprehend an attack from the hands of another, he is justified in carrying a pistol on his person, even though he carry it concealed, provided he carry same for defensive and not for offensive purposes."

"(35½) I charge you gentlemen of the jury if you find from the evidence that Henry Spence served upon Glenn Lawler on the 5th day of January, 1923, a notice demanding possession of the premises upon which the difficulty occurred, then I charge you that that constituted an acknowledgment on the part of the said Henry Spence that Glenn Lawler was in possession of said premises at the time of said notice."

J. F. Thompson, of Birmingham, and Douglass Taylor and Lanier & Pride, all of Huntsville, for appellants.

Demurrer to plea of former jeopardy should have been overruled. Code 1907, § 7314; Andrews v. State, 174 Ala. 11, 56 So. 998, Ann. Cas. 1914B, 760; Reynolds v. State, 1 Ala. App. 24, 55 So. 1016; Baysinger v. State, 77 Ala. 60. Defendants should have been permitted to show their conversation with reference to going to the place where

the difficulty occurred. Maddox v. State, 159 Ala. 58, 48 So. 689; Tesney v. State, 77 Ala. 33; Ingram v. State, 13 Ala. App. 147, 69 So. 976; Campbell v. State, 133 Ala. 81, 31 So. 802, 91 Am. St. Rep. 17; Harris v. State, 96 Ala. 24, 11 So. 255; Crenshaw v. State, 205 Ala. 256, 87 So. 328. The physical condition of defendant Spelce was material. 21 Cyc. 911; Dunn v. State, 143 Ala. 67, 39 So. 147; Gunter v. State, 111 Ala. 23, 20 So. 632, 56 Am. St. Rep. 17.

Harwell G. Davis, Atty. Gen., and Lamar Field, Asst. Atty. Gen., for the State.

Demurrer to plea of former jeopardy was properly sustained. Const. 1901, § 9; Code 1907, § 7341; Hawes v. State, 88 Ala. 60, 7 So. 302; Andrews v. State, 174 Ala. 11, 56 So. 998, Ann. Cas. 1914B, 760; 3 Mayfield's Dig. p. 1166. Testimony offered by defendants as to their conversation before going to the scene of the difficulty was not within the rule of Moulton v. State, 19 Ala. App. 446, 98 So. 709, and Hill v. State, 210 Ala. 221, 97 S. 639.

FOSTER, J. The appellants were tried jointly on an indictment charging murder in the first degree, were convicted of murder in the second degree, and each was sentenced to the penitentiary for a term of 14 years.

On May 22, 1923, the appellants separately and severally filed a plea of former jeopardy averring that they had previously, on March 4th, been put to trial in the case, and that the court entered an order of mistrial without the consent of either of the defendants and against the objections of each of the defendants, and without assigning the reason or cause for the mistrial, and without determining that there was a manifest necessity for the discharge of the jury without giving a verdict, or that the ends of justice would be defeated, and that the order for the discharge of the juror and the mistrial was as follows:

"The mother of one of the jurors impaneled to try these defendants, while the trial of the case was in progress, and it being necessary to discharge said juror from the further consideration of this case, a mistrial is ordered."

The above was a copy of the bench notes made by the trial judge and the order for mistrial upon which the plea of former jeopardy was based. Demurrer was interposed to the plea on the grounds that it affirmatively appeared by said plea that the judge trying said cause declared a mistrial because it was necessary to discharge one of the jurors impaneled to try said cause, and that the fact of such necessity therefor was entered upon the bench notes of said court by said judge, and upon the minutes of the court, and that it appears from said plea that, in the opinion of the court or judge trying said

cause, it was necessary to discharge one of the jurors trying said cause; and the defendants moved that the clerk of the court be required to write up the minutes of the court in accordance with the bench notes of the judge dated March 6, 1923, and also moved to strike from the bench notes and the minutes the word "dying." The motions were submitted on the following agreed statement of facts:

"Whereupon said motions were submitted for the consideration of the court upon the following agreed statement of facts: On May 30, 1923: That on 6th of March, 1923, this case having gone to trial, and the testimony of the state having closed, the then presiding judge, Hon. Osceola Kyle, entered an order on the trial docket as his bench notes at that time, in words and figures as follows: 'March 6, 1923. The mother of one of the jurors impaneled to try these defendants, while the trial of the case is in progress, and it being necessary to discharge said juror from the further consideration of this cause, a mistrial is ordered.'

"That on May 30, 1923, the circuit court of this county being in session, Hon. James E. Horton, Jr., one of the judges of the circuit presiding, Hon. Osceola Kyle, the other judge of this circuit, who is presiding judge of the circuit, came to Huntsville and without notice to the defendants or to the counsel, and without motion on the part of the state to amend the bench notes or their memorandum nunc pro tunc, ex mero motu added to the bench notes as above quoted, and after the words 'these defendants,' the word 'dying,' and wrote up the cause of the mistrial, or docketed the cause of said trial, and did prepare the following judgment entry made and entered in said cause, and entered upon the minutes of said court as the judgment in said cause, which is now upon the minutes of said court, and is in words, to wit: 'State of Alabama v. George Spelce, Glenn Lawler. May 30, 1923. Comes the defendant separately and severally and move the court to strike from the bench notes and minute entry as appears on the trial docket of this court, as set out in their motion, and the same being submitted to and duly considered by the court, it is therefore ordered and adjudged by the court that said motion be and the same is hereby overruled.'"

Demurrer to the plea of former jeopardy was sustained and the motions of the defendants above referred to were overruled by the court, and exception reserved to this action of the court.

Section 9 of the Constitution of 1901 provides that no one shall be twice put in jeopardy for the same offense and also that—

"Courts may, for reasons fixed by law, discharge juries from the consideration of any case, and no one shall gain an advantage by reason of the discharge of the jury."

Section 9, supra, delegates to the Legislature authority to provide for a mistrial for any reason to be fixed by law. Andrews v. State, 174 Ala. 11, 56 So. 998, Ann. Cas.

1914B, 760. By section 7314, Code 1907, the Legislature provided for the discharge of juries without the consent of the parties, "when in the opinion of the court or judge there is a manifest necessity for the discharge, or when the ends of justice would otherwise be defeated." And said section also provides that, where "the jury is discharged without a verdict, a mistrial shall be entered upon the minutes of the court, assigning the reason or cause for the mistrial; and no person shall gain any advantage by reason of such discharge of the jury."

[1] Unless something has occurred after the jury were sworn, which in legal contemplation necessitates the withdrawal of the case from the jury, the discharge of a jury without verdict and before the expiration of the term acquits the defendant. The facts presenting such necessity are the sickness of the judge (Nugent v. State, 4 Stew. & P. 72, 24 Am. Dec. 746); or a juror (Powell v. State, 19 Ala. 577); or the prisoner (Brown v. State, 38 Tex. 482); or the escape of the prisoner (State ex rel. Battle, 7 Ala. 259); the sudden illness of the solicitor, unless he have assistants or associates who can proceed with the case (U. S. v. Watson, 3 Ben. 1 Fed. Cas. No. 16,651); the serious illness of a juror's wife (Hawes v. State, 88 Ala. 37, 7 So. 302); the death of a juror's son (State v. Davis, 31 W. Va. 390, 7 S. E. 24).

In Ned's Case, 7 Port. 187, the following propositions were laid down:

(1) "That courts have not, in capital cases, a discretionary authority to discharge a jury after evidence given." (2) "That a jury is, ipso facto, discharged by the termination of the authority of the court to which it is attached." (3) "That a court does possess the authority to discharge a jury, in any case of pressing necessity, and should exercise it whenever such a case is made to appear." (4) "That sudden illness of a juror, or of the prisoner, so that the trial cannot proceed, are ascertained cases of necessity, and that many others exist, which can only be defined when particular cases arise," etc.

[2] In the case at bar the necessity for discharging the jury arose from the death of the mother of one of the jurors. It requires no argument to show that the effect upon the mind of the juror upon receiving information of the death of his mother was to render him incapable of that calm and deliberate consideration and reasoning which is due in the investigation of cases of this importance and magnitude. It was unquestionably the duty of the court to discharge the juror under such circumstances.

[3, 4] The plea of former jeopardy, setting out a copy of the judge's bench notes, affirmatively showed the necessity and the finding by the court that it was necessary to discharge the juror and that for that reason a mistrial was entered. The bench notes were sufficient to show what the judgment was intended to be and it was the duty of the clerk to enter upon the minutes of the court the judgment intended as evidence by the bench notes. The trial judge did not exceed his authority in amending ex mero motu the bench notes during term time by supplying a clerical omission. The minute entry by the clerk during the term complied with the requirements of the statute and was sufficient. The defendants cannot be said to have been placed in jeopardy within the meaning of the constitutional provision, supra. The court did not err in sustaining the demurrer to the plea or in overruling the motions of the defendants as to instructions to the clerk in writing up the minutes.

The state's testimony was directed to showing that the homicide occurred about 10 o'clock in the morning on the premises which Glenn Lawler, one of the appellants, had sold to the deceased. A controversy arose as to the rights of the appellant Lawler and the deceased, Spence, on the land sold by Lawler to Spence. The appellant Lawler went to the premises early in the morning and was loading some of his effects in a wagon to remove them from the place when a controversy arose between Lawler and Spence as to the right to immediate possession of the property; Lawler claiming that he had a right to remain there longer if he desired, and Spence claiming the right in himself to immediate possession. Some words were passed and Lawler left the place in his automobile and went to a store and obtained a gun and some shells and inquired over telephone for his father-in-law, Spelce, one of the appellants, but did not get in telephone communication with Spelce. Lawler started back along the road in the direction of the premises where he had left Spence and overtook the automobile in which Spelce and one Daniel were riding. Both cars proceeded along the road in the same direction and, upon reaching a point opposite the barn at which Lawler had left Spence, both Spelce and Lawler stopped their cars and proceeded (Spelce in front) towards the barn where Spence was. Spelce asked Spence if he knew what he was doing, and according to the state's evidence Spelce cursed Spence and Spence slapped him, whereupon Spelce drew a pistol and fired three shots at Spence, killing him. The state's witnesses present testified that Spence had nothing in his hand when he slapped Spelce, and that Spelce fired one shot before Spence picked up a brush; that the other two shots were fired in quick succession; and that Spence was going away from Spelce at the time the last two shots were fired, and, when Spence went in the barn door, Lawler got his shot gun from his automobile and fired a shot in the direction of Spence, not striking him, but the load lodging in the barn.

The evidence for the defendants tended to

show that the deceased was killed by Lawler; that deceased was advancing on Lawler with a scantling at the time Lawler fired on him, and that the killing was in self-defense; that Lawler had contracted to sell the premises where the difficulty occurred, and that Lawler was still in the possession of the same and he and his family spent the night before at his father-in-law's, and that he went to the premises that morning to complete moving his effects. The appellant's version of their movements that morning was that Lawler left Spelce's house and went to the scene of the difficulty, where, after threatened violence from the deceased, Lawler left; that Spelce, on the same occasion, left his house and picked up Kibble Daniel in his automobile and went to Ryland, and on his way back from Ryland met Lawler in the road, and all three, Spelce and Daniel in one car, and Lawler following in another car, went to the premises where the difficulty occurred, which was about a mile from where Spelce, Daniel, and Lawler met, when Spelce and Lawler were attacked by deceased and Spence killed; that immediately before the difficulty occurred, and at the time that Spelce first addressed the deceased, he (Spelce) asked deceased about moving a house from the premises to be sold to deceased, and at that time presented to deceased the paper authorizing the removal of the house, and that the conversation immediately prior to the difficulty began with reference to a discussion of the right of George Spelce to so remove said house. The paper authorizing the removal of such house was offered in evidence.

[5] Error, if any, in the court's overruling the defendant's objection to the question propounded by the state to Louise Spence, "When did your husband buy this land from Glenn Lawler?" was clearly without injury. The deed showing the date of purchase was in evidence, and there was no claim that the deed did not show the correct date of purchase.

[6] The defendant interposed objection to the following question by the state to Louise Spence:

"What was the agreement between your husband and Glenn about when he was to give possession or move out of the barn and house?"

The grounds assigned were that it was illegal, irrelevant, incompetent, and immaterial. The answer was:

"Glenn told him he would give possession by the 1st of June or 1st of July, etc."

The evidence was relevant as tending to explain the presence of the parties at the time of the difficulty and to throw light upon the controversy at that time about the right to possession.

[7] The defendants could not have been injured by the court sustaining objection by state to defendants' question to Louise Spence as to when the first payment was to be made on the property—the deed in evidence set out the dates of payments and showed the first payment due February 1, 1923.

[8, 9] It was not competent for the defendants to show that, when Lawler, Spelce, and Daniel met on the road, going to the place of the difficulty, they had a conversation in which "nothing was said about having any trouble with Spence, or going there or doing anything to him or having any trouble with him." Nor was it competent for the defendant to show that in such conversation Lawler asked Spelce if he had seen Houston Hughes that morning; that he had made an engagement with him to help him move; and that he had not found him and wanted to know if Spelce knew anything about him or where he was. The conversation about Hughes was irrelevant to any issue in the case.

[10] It is insisted by learned counsel for appellants that the evidence offered to show what was not said at the time of the meeting between defendants Spelce and Lawler and the witness Daniel on the road just before going to the place of the fatal difficulty, falls within the rule that contemporaneous declarations, made by a party setting out on a journey, as to the object and purpose of going, are admissible as part of the res gestæ of the act of going to the place and tending to explain and give character to his presence and conduct at the place of the homicide. The rule that contemporaneous declarations, made by a party setting out on a journey, as to the object and purpose in going to the place, are admissible in evidence as of the res gestæ of the act of going, has long been established by the decisions of our Supreme Court. Maddox v. State, 159 Ala. 58, 48 So. 689; Harris v. State, 96 Ala. 24, 11 So. 255; Ingram v. State, 13 Ala. App. 147, 69 So. 976; Crenshaw v. State, 205 Ala. 256, 87 So. 328. But we know of no rule which allows proof to be made of the absence of declarations. In the instant case it was not proposed to show that any declarations about going to the place of the homicide were made, on the contrary the defendant offered to show that—

"Nothing was said about having any trouble with Spence, or going there or doing anything to him."

The offer was to show that no declarations were made. Evidence that no declarations were made does not fall within the rule allowing evidence of contemporaneous declarations of a party setting out on a journey as explanatory of the presence and conduct of the defendants at the place of the homicide. The evidence offered was not in contradiction of any evidence for the state. It was therefore not permissible for the defendants on their direct examination to show that nothing was said between Spelce

and Lawler at the time they met on the road going to the place of the homicide "about going there or about having any trouble with the deceased." The fact that they met on the road and proceeded in their cars to the place of the difficulty in which deceased was killed and all the facts of the difficulty were in evidence. Any declarations about going there and the purpose of the trip were admissible, but it was not permissible to show the negative that no such declarations were made.

It was not competent for defendant to show that no conversation occurred between Lawler and Spelce about going down to Spelce's house and having any trouble.

[11] It was not competent for the defendants, on direct examination of the witness Daniel, to show that Spelce, in that conversation, did not make any promise, threat, or any statement to the effect that he was going to Spence's house to have any difficulty or trouble with Spence.

[12] It was not competent for the defendant to show by Lawler that he was going to look for that negro that morning. Evidence of an uncommunicated motive is not admissible.

[13] It was not competent for defendants to show by the defendant Lawler that he did not tell Spelce he wanted him to go down to Spence's for any purpose.

It was not competent for defendants to show by Lawler that there was no conversation between him and George Spelce with reference to going down to Spence's and having any difficulty.

It was not competent for the defendants to show by Lawler that Spelce did not make any promise or make any statement at that time with reference to going to Spence's house for any trouble or any difficulty with Spence.

[14] The question by defendant to Glenn Lawler, "Was he (Spelce) arranging to move the house?" was objectionable as calling for the conclusion of the witness.

It was not competent for defendant to show that he had turned the letter over to his father-in-law (Spelce) "with the understanding that he was to move the house."

[15] It was competent for defendants to show by Lawler that he "had never surrendered possession of the property," and that he, his wife, and child stayed in a certain house; but the defendant Lawler testified later to all of these facts and defendants had full benefit of the testimony.

[16] Defendants asked George Spelce if he had any impediment in his leg, had it been cut, was it in such condition that he had just gotten off of crutches.

The defendant received the benefit of all of the legal testimony to which he was entitled as to his size and physical condition in his own and in the testimony of Dr. Howard.

It was not competent for defendants to show by Spelce that there was no conversation between him and Lawler about going to Spence's, etc.

It was not competent for defendants to show by Spelce that he made no promise or statement with reference to going to Spence's house to have any difficulty with Spence.

[17] The court did not err in sustaining objection to the question propounded to the defendant Spelce, "Was there any understanding between you and Glenn that you had a right to move that house?" Witness cannot testify to an understanding.

[18] The evidence elicited by the question to Spelce, "You paid that in order to enable Glenn to make a deed to Spence," was immaterial and called for uncommunicated motive.

[19] It was not competent for defendant to show by Spelce that he had been carrying a pistol for some time; that he had been threatened by some other parties before that. There was nothing in the evidence that showed he was justified by such threats in carrying the pistol at the time and place of the fatal difficulty.

[20] Dr. Howard, a witness for the defendants, testified that he was one of the physicians who treated George Spelce during the last few years; that on January 15, 1923, he was weak physically, and had been for three or four years; that he knew something about his physical condition at that time being affected by his getting his leg nearly cut off; that his condition was affected at that time by reason of that wound or injury; "that he was weak and walked poorly, naturally a frail man, and more so lately for the past few years." It was not competent for the defendant to show the details of a surgical operation, or whether Spelce could eat solids or only liquids, or the details of the injury he received, or whether he had been on crutches just before the 15th of January, 1923. The witness had testified to the fact of the physical weakness; that his leg had nearly been cut off; and that he was a frail weak man.

[21] There being evidence of self-defense, it was competent to show the relative size of the defendant and the deceased and the general physical condition of the defendant Spelce. This was a pertinent inquiry as tending to show the relative conditions of the parties at the time of the homicide. Gunter v. State, 111 Ala. 23, 20 So. 632, 56 Am. St. Rep. 17.

In Mann v. State, 134 Ala. 1, 32 So. 704, our Supreme Court, speaking through McClellan, C. J., says:

"There was abundant evidence in the case going to show that Dickson was a strong, powerful man physically and that Mann was weak and delicate, and this was not questioned. There was, therefore, neither occasion nor excuse for going into an inquiry as to how it

came to pass that Mann was not robust and strenuous, as for instance that he led a sedentary life; that he had not taken much outdoor exercise, and that his work was not such as to harden his muscles; that he had lung trouble," etc.

In the instant case the evidence showed that the defendant Spelce was a weak, small man, weighing between 100 and 125 pounds and that the deceased was a strong man, weighing between 165 and 180 pounds. It was immaterial to pursue the inquiry further and show the details of the defendant Spelce's physical injuries.

[22-25] The defendants propounded the following question to defendant's witness J. A. Crowson:

"I will ask you whether or not a man riding around the corner on horseback could see anything going on the other side of that wagon; if so, how much could he see?"

The homicide occurred about 10 o'clock a. m. January 15, 1923. The trial in which the witness was testifying commenced May 22, 1923. Witness Crowson's testimony was as follows:

"The evening of the difficulty, I am not positive, I went up to the place where this difficulty occurred. I saw one wagon standing there. To the best of my recollection there was a dresser without a glass, a blacksmith forge, a big sloping up thing large at the bottom, barrels, and baskets on the wagon. I was out there day before yesterday at the same place and saw a wagon with part of the same things on it. It did not have as much stuff on as the wagon I saw the day of the difficulty. When I saw this wagon, it was standing in the front door of the west shed of the barn, about 10 feet from the barn and pointing toward the road. I was there when the photographer took some of the pictures with the wagon in that position. I saw the boys standing on the east side of the wagon before the picture was taken, saw the top of my boy's head across the wagon myself. The small man was a little bit taller than George Spelce, possibly 2 inches. Don't know how tall the young man was there day before yesterday, possibly 6 feet, good tall man. I don't know. I was down at the corner of the crossroads and looked over in the direction of the barn, looked at two men about the same height as Spelce and Spence." Here the question objected to was asked, and the defendants stated that they expected the answer to be "that he could not see anything but the tiptop of their heads." "The witness further testified that, while he was down there, he could not see what the men were doing on the east side of the wagon."

More than four months had elapsed from the date of the homicide to the time the witness Crowson made an examination of the premises and the test inquired about. The topographical conditions appear to have been substantially the same at this time (May) as when the difficulty occurred (January). Witness testified that he was at the corner of the crossroads. The record does not show that he rode horseback around the corner in making the test inquired about. It was not shown that he was in the same position as the state's witness Wall, who testified that he was riding horseback around the corner and saw the difficulty. For aught that appears from the evidence of witness Crowson, he may have been walking or riding in an automobile or a wagon, and may not have had the same view from horseback which was open to the witness Wall. Nothing was asked about the size of the man Wall or the size of the horse from which a man could not see. Wall testified that the wagon was not between him and the men engaged in the difficulty and that he did not have to look over the wagon to see them. There was no evidence that the wagon was in the same place at the time the witness Crowson made the examination of the surroundings as when the difficulty occurred. There was no evidence that the wagon witness Crowson saw on the evening of the difficulty was in the same place as was the wagon at the time witness Wall rode around the corner at the time of the difficulty. The physical conditions at the time of the difficulty and at the time of the visit of witness Crowson a few months later were not shown to be similar. The burden is upon the party offering the evidence to show similarity in essential conditions. A substantial similarity is sufficient, and it is ordinarily for the court to determine whether the conditions are sufficiently similar to warrant the admission of the evidence.

In Ala. Great Southern R. R. Co. v. Burgess, 114 Ala. on pages 595 and 596, 22 So. 171, Justice Head, speaking for the court, says:

"It became a question on the trial how far from the place of injury (which was identified by testimony as being on or near the end of a certain trestle) these children could be seen on the track, and recognized as being children, from the direction the train came. The plaintiff's father was permitted to testify to an experiment made by him and others about a month after the injury. They placed the little boy (plaintiff) and one of witness' little girls, a size larger than the one that was killed, on the trestle and left a boy 17 years old with them, and went down the track 700 yards, and from that point they could see objects on the trestle. They then walked toward them 200 yards, and stopped, and there saw the two children on the trestle; and the witness testified that he could tell that they were children a distance of 500 yards. The other persons who were with the witness testified to substantially the same. This testimony, and the questions which brought it out, were objected to on the grounds that they were irrelevant, and that the experiment was made out of court when defendant was not present, and because the conditions were not shown to be the same as on the occasion of the accident. Exceptions were duly reserved to the overruling of these objections.

"We think, in connection with the other evidence, to which reference will be made, it was relevant to show how far the children, who were injured, could have been seen by the engineer, and by him ascertained to have been children. It is true that mere negligence, on his part, in failing to discover them, or any other negligence of whatever character, which did not involve actual knowledge on the part of the engineer of the plaintiff's peril, in time to avoid the injury, would give no right of recovery by the plaintiff, under the peculiar issues of this cause; but, if there was other evidence, tending to show knowledge of such peril by him, it was, competent, in aid of that evidence, to show that the conditions were such that the peril might have been discovered in time to avert the injury, and it is to be supposed the trial court would give the jury fully to understand the legal scope and purpose of the evidence and did not suffer them to make mere negligence, in not discovering the peril, or otherwise, the basis of a recovery by the plaintiff, except the negligent failure, if there was such, to use the means at hand, after actual discovery of the peril.

"The writer was disposed to think the experiment, the evidence of which is objected to, could safely and properly be regarded as a practical method of shedding some legitimate light upon the inquiry whether or not these children, and the fact that they were children, could have been discovered by the engineer in time to stop the train before reaching them by the exercise of due and reasonable care, leaving to the jury to consider such differences of conditions, under which the injury and experiment occurred, as the case may disclose, and to make due allowances for such differences; but, upon due consideration, we are of opinion that such evidence will not furnish, or aid in furnishing, a safe guide to the jury in the determination of the question whether the engineer exercised reasonable care to prevent the injury, after he discovered the plaintiff's peril, or even before such discovery, if that were an issue in the cause. The conditions are too variant. Tesney v. State, 77 Ala. 33. The physical and topographical facts surrounding the injury and the place of the injury should be put before the jury, leaving them to draw just conclusions touching the issue."

Where the conditions under which the witness Crowson, who was not present at the time of the difficulty, made his experimental observations, some months after the difficulty, are not shown to be the same as those under which the state's witness Wall testified he saw the fight, the court properly sustained objection to the question propounded to witness Crowson relating to his experimental observations. Sherrill v. State, 138 Ala. 3, 35 So. 129.

[26] Moreover, the defendants had full benefit of this line of evidence in the testimony of two witnesses J. E. Tipton and Hal Bone, who were there at the same time the witness Crowson was there, and each of whom testified that he rode around the corner in question and could not see anything those men on the other side of the wagon were doing while he was coming around that corner on horseback.

Charges 2, 3, 6, 7, 9, 13, 29, and 74 were faulty, and were properly refused. It has been repeatedly held by this court and our Supreme Court that "supposition" has no legitimate sphere or habitation in judicial administration. Johnson v. State, 102 Ala. 18, 16 So. 99; Walters v. State, 19 Ala. App. 92, 95 So. 207; Rosenblum v. State, 19 Ala. App. 442, 98 So. 216; White v. State, 19 Ala. App. 332, 97 So. 234; Dawson v. State, 196 Ala. 593, 71 So. 722; Richardson v. State, 191 Ala. 21, 68 So. 57; Smith v. State, 197 Ala. 193, 72 So. 316.

[27] Charge 14 is covered by given charges 5 and 51 and by the oral charge of the court, and its refusal was not error. Refusal of requests covered by charges given, or by the oral charge of the court, is not error. Brand v. State, 13 Ala. App. 390, 69 So. 379; Hill v. State, 210 Ala. 221, 97 So. 639; White v. State, 19 Ala. App. 332, 97 So. 234; Smith v. State, 92 Ala. 30, 9 So. 408; McKenzie v. State, 19 Ala. App. 319, 97 So. 155; Acts of Ala. 1915, p. 815.

[28] Refused charge 42 was faulty, if for no other reason, for that it pretermits an honest belief on the part of the defendants as to whether or not the deceased was about to attack him. Cheney v. State, 172 Ala. 368, 55 So. 801; Tyler v. State, 207 Ala. 129, 92 So. 478.

That one may have a formed design to take life and be acting in self-defense is covered by given charge 28.

Charge 120 was faulty. It omits the duty to retreat, one of the essential elements of self-defense.

[29] Charge 109 is argumentative and was properly refused.

Charge 46 is covered by given charge 62.

Charge 112 omits freedom from fault and was properly refused.

Charge 55 is covered by given charge 21.

[30] Charge 59 is not predicated upon the evidence. Edwards Case, 205 Ala. 160, 87 So. 179.

Charge 60 is covered by given charge 41.

[31] Charge 119 is not predicated upon the evidence, is invasive of province of the jury, and was properly refused.

Charges 18½ and 19½ invade the province of the jury and single out the evidence.

[32] Charge 100 is misleading and faulty. A good reason to apprehend an attack from some other person at another time and place would not justify the defendant in carrying a pistol concealed at the time and place of the fatal difficulty.

Charge 99 is faulty. It omits freedom from fault and duty to retreat, elements of self-defense.

Charge 97 omits the elements of self-defense and was properly refused.

[33] Charges 93 and 94, general charge as to murder in second degree, were properly refused. There was a conflict in evidence, and ample evidence to convict of murder in second degree, if believed by the jury beyond a reasonable doubt.

[34] Charges 91 and 92, general charge as to murder in first degree, were properly refused. There was a conflict in the evidence. The defendants cannot complain of the court's refusal of the charges as they were convicted of murder in the second degree and by this verdict of the jury acquitted of murder in the first degree.

Charge 95 was the general charge for the defendants, and was properly refused as there was a conflict in the evidence and ample evidence to justify a conviction.

Charges 23 and 35 are faulty; they pretermit freedom from fault and the duty to retreat, two elements of self-defense.

[35] Charge 35½ was faulty, was calculated to mislead the jury, and was properly refused.

Charge 121 is not predicated upon the evidence and was properly refused.

Charge 113 is faulty. It omits freedom from fault in bringing on the difficulty.

Unnumbered charge, which for convenience we letter Z, is faulty, if for no other reason, as not predicated upon the evidence.

The charge in writing given at the request of the state was free from error.

The motion for a new trial, which was based upon the matters hereinabove decided, was properly overruled. There is no error in the record.

The judgment of the circuit court is affirmed.

Affirmed.

### On Rehearing.

After the affirmance by this court of the judgment of conviction and pending the application for rehearing, Glenn Lawler, one of the appellants, dismissed his appeal. The case is now here on the application of the appellant George Spelce for rehearing.

In the original opinion there should have been inserted on the tenth line on page 3 [see 103 So. 698, column 1, line 37], ante, p. 415, after "to wit," the following:

"This March 6, 1923, it being made known to the satisfaction of the court that the mother of C. S. Vann, one of the jurors impaneled to try these defendants, had died while the trial of the case was in progress, and it being the opinion of the court that it was necessary to discharge said juror from further consideration of this cause, and therefore it being the opinion of the court that there is manifest necessity for the discharge of the jury trying said cause, it is therefore ordered and adjudged by the court that there be and is hereby declared a mistrial of said cause."

The trial was again set for March 9, 1923, and on March 12, 1923, the jury failing to agree, a mistrial was ordered with the consent of the defendants. On May 22, 1923, another trial was had and at that time the defendants filed their plea of former jeopardy to which demurrer was sustained.

[36] A trial judge ex mero motu, during term time, may, without a motion to amend nunc pro tunc, amend the bench notes by supplying an inadvertently omitted word, and may require the clerk to write the minutes in accordance with the bench notes as amended, so as to make the record speak the truth.

[37] If it should be conceded that there was technical error in the ruling of the court sustaining demurrer to the defendant's plea of former jeopardy, before the minute entry had actually been written by the clerk, this cannot avail the defendant, as the record affirmatively shows that no injury resulted to him. If he were given another trial he would be confronted by the minute entry above set out, which complies with all the requirements of the law that the judge spread upon the minutes his reasons for ordering a mistrial. The death of the mother of one of the jurors during the progress of the trial was good reason for discharging the juror and ordering a mistrial.

[38] Learned counsel for appellant, in their brief on application for rehearing, insist that a careful examination of the record will show that questions were asked witnesses eliciting an affirmative answer with reference to statements made by defendants on the morning of the fatal difficulty about going down to the deceased's place, and direct attention to the questions propounded to defendant's witness Kib Daniel on pages 43 and 44 of the record. We find the following:

"The witness (Daniel) was then asked this question: 'Did you have any conversation with Mr. Lawler?' Whereupon the state objected to the question on the ground that it was immaterial. The court sustained the objection.

"The defendant then and there excepted to the action of the court in sustaining the objection and stated in open court that they expected to prove by the witness in answer to this question that there was a conversation, and that nothing was said in the conversation about having any trouble with Spence, or of going there or doing anything to him or having any trouble with him, and, further, that Lawler in such conversation asked Spelce if he had seen Houston Hughes that morning; that he had made an engagement with him to help him move; that he had not found him and wanted to know if he knew anything about him, or where he was.

"The witness was then asked by the defendant the following question: 'Mr. Daniel, was there any conversation at that time between Mr. Glenn Lawler and George Spelce, at that place when they met, with reference to going down to Mr. Spence's and having any difficulty?' To this question the state interposed an objection which was sustained by the court.

"The defendant then and there duly excepted

to the action of the court in sustaining the objection. The defendant then stated to the court that they expected to show by the witness in answer to this question that he did not hear any conversation between Glenn Lawler and George Spelce about going to Spence, and having any trouble.

"The witness was then asked the following question by the defendant: 'Did Mr. Glenn Lawler tell Mr. Spelce on that occasion that he wanted him to go down to Spence's house?' To which question the state objected and the court duly sustained the objection. The defendant then and there duly excepted and then and there stated that they expected the witness to answer in the affirmative.

"The witness was then asked this question by the defendant: 'Did Mr. George Spelce make any promises then or any statement at that time about going to Spence's house for any difficulty with him?' To this question the state interposed objection, the court sustained the objection, and the defendant then and there duly excepted. The defendant stated that they expected to prove by the witness in answer to the question that Mr. George Spelce, at the time inquired about, did not make any promise, threat, or any statement to the effect that he was going to Spence's house for the purpose of having any difficulty or trouble with Spence."

Appellant's counsel also call attention to certain questions propounded to Glenn Lawler as appears on pages 53 and 54 of the record as follows:

"The witness was then asked the following question by his counsel: 'Did you tell Mr. Spelce that morning that you wanted him to go down to Spence's with you for any purpose?' The state objected to this question, the court sustained the objection, and the defendant then and there excepted, stating to the court that they expected the answer to be the same as they expected the answer of the witness Daniel to be to the same question.

"The witness was then asked this question: 'Was there any conversation that time between you and George Spelce with reference to going down to Mr. Spence's and having any difficulty?' The state objected to this question, the objection was sustained by the court, and the defendant then and there excepted, stating to the court that they expected the answer of the witness to be that there was no such conversation.

"The witness was then asked the following question by his counsel: 'Did you tell Mr. Spelce on that occasion that you wanted him to go down to Spence's house?' The state interposed an objection, which was sustained by the court. The defendant then and there excepted, stating that they expected the witness to answer in the affirmative.

"The witness was then asked this question: 'Did Mr. George Spelce make any promise or make any statement at that time with reference to going to Spence's house for any trouble or difficulty with Spence?' The state interposed an objection to this question, which was sustained by the court, and the defendant then and there excepted to this ruling of the court, stating that they expected the answer to be that no such statement or promises were made."

For aught the court knew the purpose of the questions was to elicit testimony to the effect that nothing was said about going down to Spence's house to have a difficulty. The defendant's counsel many times stated to the court that such was the purpose of certain questions, and it is clear that the defendant was insisting in a proper way, certainly, upon getting such testimony before the jury. If anything was said which would have been admissible as part of the res gestæ of the going the court was entitled to know. So far as we are able to ascertain there is no intimation anywhere in the record that such testimony was offered and brought to the attention of the court.

"Unless it clearly appears that the answer to the question would be admissible and relevant, counsel must state the facts expected to be elicited, showing their materiality, before the court can be put in error for sustaining an objection to the question." 4 Michie's Dig. par. 437, p. 294.

The application for rehearing is overruled.